KANSAS PACIFIC RAILWAY CO. v. CHARLES C. CULP.

SAME PLAINTIFF v. JOHN H. PRESCOTT.

1. TITLE TO LANDS—*Taxation.* The right to a patent is sufficient to subject lands to taxation.*

2. ————— *Patent.* Where land is granted upon conditions, with a provision for the issue of a patent, the performance of those conditions gives a right to a patent.

3. ————— *Grant; Conditions.* Where land is granted to a company for the sole purpose of aiding in the construction of a railroad and telegraph lines, and such railroad and telegraph lines are constructed to the approval of the government, the company acquires such an interest in the land as renders it subject to taxation, even though it has not received a patent, and has not paid the cost of surveying, selecting and conveying the same, and the fees of the register and receiver of the land office, required by law to be paid before the issue of the patent.*

4. ————— A grant of certain specified lands, excepting such as have been sold, reserved or otherwise disposed of by the United States, passes the title to all not embraced within the exception.

5. ———— A provision in a grant that all lands so granted which shall not be disposed of by the company within three years after the completion of the road, "shall be subject to settlement and pre-emption like other lands, and at a price not exceeding one dollar and twenty-five cents per acre to be paid to said company," reserves no such interest to the government as will render the land not subject to taxation.*

## Error from Saline District Court.

Two ACTIONS, brought by the *K. P. Railway Company,* one against *Culp,* and the other against *Prescott,* to quiet plaintiff's title to certain lands, and remove pretended tax-titles held by defendants, and which plaintiff claimed were clouds upon its title. *Culp* claimed 160 acres of land in section 31, town 7 south, range 4 west; and *Prescott* claimed 160 acres in section 3, township 13 south, range 1 west. Both cases were tried upon an agreed statement of facts. In both cases it was agreed that the lands were assessed and taxed, those claimed by *Prescott* in and for the year 1868; those claimed by *Culp* in and for the year 1869; that the taxes were not paid; that the lands were duly advertised and sold by the treasurer of Saline county for such unpaid taxes; that *Prescott* was the owner of the one tax-sale certificate, and *Culp* of the other; that at the time the lands were so assessed and taxed no patent for said lands had been issued to the *Railway Company* by the United States; that said company derives title to the same, under the act of congress, entitled "An act to aid in the construction of a railroad and telegraph line from the Missouri River to the Pacific Ocean," etc., approved July 1, 1862, (12 Stat. at Large, 489,) and the amendatory act of July 2, 1864, (13 Stat. at Large, 356;) that said company had completed, at the time said taxes were levied, the section of forty miles of railroad, in which said land lies, to the acceptance of the President of the United

---

[* REPORTER'S NOTE.—Both these cases were removed by the *K. P. Railway Co.* to the supreme court of the United States, where they were heard at the December Term 1872, and decided in March, 1873. Both judgments were reversed—the supreme court of the United States holding that the lands were *not* subject to taxation. It is believed that the question is of sufficient importance to give the decision of the U. S. supreme court in full. The opinion was delivered by

MILLER, J.: This writ of error to the supreme court of the state of Kansas brings.

States. In *Prescott's* case it was further admitted that the land claimed by him was a part of the grant made by said act of July 1, 1862, and that the *Railway Company*, at the time the land was assessed, had not made a "location" or entry of said land at the local land office of the United States of the district wherein the land lies, nor paid the one dollar per quarter-section as required by law. In *Culp's* case it was further admitted that the land claimed by him was a part of the additional grant made by the amendatory act of July 2, 1864, and that at the time the land was assessed it had not been selected and surveyed, nor had the cost of selecting and surveying been paid or deposited as required by the said act of congress, nor had any "location" or entry of the same been made at the local land office, nor the fee of one dollar per quarter-section been paid by the plaintiff for an entry or a "location." The cases were tried at the June Term 1870, of the district court, and in each case judgment was given for the defendant. The *Railway Company* brings the cases here for review.

*McClure & Humphrey*, for plaintiff in error:

1. The true question presented in these cases is, who was the owner of the lands in controversy at the time they were assessed and taxed—if the United States, then they were not subject to taxation nor to state legislation. If the title had passed to the plaintiff by any of the recognized modes of conveying title to public lands, then it is conceded the lands were subject to state taxation.

It is evident the words of the grant do not, and were not intended to operate as a conveyance of the lands to the plaintiff company, for, 1st, before the plaintiff could avail itself of the benefits of the grant it was under obligations to construct a railroad and telegraph line within the limits named

before us a record involving the right of that state to tax, under certain circumstances, the land granted by congress to the Kansas Pacific Railway Co. to aid in the construction of their road. The case was heard in the state courts on an agreed statement of facts which presents the simple question whether the land was subject, in the year 1868, to state taxation. It was contended by plaintiff in error that under certain provisions of the acts granting this land it was not.

The statute which gave alternate sections of land on each side of said road, within

in the act of congress; 2d, the provisions of the act were subject to the acceptance of the company on their part; 3d, it could not be known or ascertained what lands would inure to the grant until the line of the railroad became definitely fixed; 4th, and then it would be necessary to ascertain what parts of the odd-numbered sections, falling within the limits of the grant, were not covered with the exceptions which excluded them from the operation of the grant, and to determine and adjust all adverse claims to the same; and 5th, the acts making these grants provide that the title to the lands shall pass by patent, and they make the payment of the fees and charges for surveying, selecting and conveying said lands a condition precedent to the issuance of the patent.

The company, by its agent, is required to file its selections of lands claimed as inuring to the grant in the local land office of the district in which the lands selected lie. The selections thus made are required to be carefully examined and tested by the land officers to ascertain if the lands selected fall within the grant and are not covered with any of the exceptions enumerated in the acts of congress, and if found correct, and on payment of the fee of one dollar each to the register and receiver, for each quarter-section located, "to be a final location." These are made conditions precedent to the vestiture of title in the company. 2 Washb. on Real Prop., (2d ed.,) 666, §§ 23, 24.

2. The title which the company is to acquire under the grant is not an absolute and indefeasible estate. The acts of congress making. this grant provide that all such lands remaining unsold or undisposed of by the said companies three years after the entire road is completed, to aid in the construction of which the grants were made, shall be subject to settlement and pre-emption, like other public lands, at $1.25 per acre—the money to be paid to said companies. To

certain limits, provided that a patent should issue to the company only as each section of forty miles in length should be completed and accepted by the president. It also contained a provision that any of these lands not sold by the company within three years after the final completion of the road, should be liable to be sold to actual settlers under the pre-emption laws, at a dollar and a quarter per acre, the money to be paid to the company. The original act of 1862 was amended in 1864 by extending the limits of the grant on each side of the road, and by several other provisions favorable to the

illustrate the practical absurdity of taxing the lands before they are selected or finally located under the grant, let us suppose that the company declines or fails to make its selections, or to sell or dispose of any part of these lands for three years after the entire road is completed: In the meantime the taxes are assessed against these lands, under the state laws, and a tax-title is acquired to the same, but such tax-title will not prevent the lands, at the end of the three years from the completion of the road, from falling back into the mass of the public lands, and becoming subject to settlement and pre-emption like other lands belonging to the government. But in such case the tax-title would be clearly defeated, and for the sole reason that it never had any validity, such lands not being subject to taxation.

3. Our Tax Law (ch. 107, Gen. Stat., § 35,) provides that "Lands *entered* on or before the 1st day of March, in each year, shall be subject to taxation for the year." Under a similar law in the states of Michigan and Arkansas, the supreme court of the United States has decided that lands entered or located at the local land office, and to which proper certificates had issued, and prior to the issuance of the patent therefor, were taxable in these states, under state laws: *Carroll v. Safford*, 3 Howard, 509; *Witherspoon v. Duncan*, 4 Wallace, 210. But in both these cases the lands had been entered at the United States land office, purchased and paid for; and nothing remained to be done on the part of the purchaser to entitle him to a patent from the government for the land purchased. By the fact of purchase and entry at the land office the land was held to have become segregated from the body of the public lands, and become the private property of the individual; and the party was in a position *legally*, with respect to his land, in which the government could not lawfully withhold the patent. In one case (3

company. But by the twenty-first section of the amendatory statute it was declared that before any of the lands granted by the act should be conveyed to the company, the cost of surveying, selecting, and conveying said lands should first be paid into the treasury of the United States by the company or party in interest, which amount should stand as a fund for the prosecution of the surveys of the public lands along the line of the road until the whole should be completed. A question is raised whether the latter provision requires this prepayment of the cost of surveying for the lands granted by

Howard,) the land was purchased; in the other, (4 Wallace,) the land was a "donation;" but in both cases it was held that the *ownership* of the land must be changed to render the lands taxable.

But in the case at bar, in what respect could the plaintiff company be deemed the owner of the lands in question before the selection and location was made? A part of the conditions of the grant had been complied with, it is true, and if the grant were to become absolute, upon the performance of the several conditions named in it, it would then be sufficient simply to perform the conditions to vest title. But in such case, the terms of grant must be such as to define the quantity of the thing granted, without additional aid from extraneous sources. The terms of the grant do not define the quantity of land which the plaintiff might take under it. It is uncertain whether the plaintiff company is entitled to 500 or 5000, or any other number of sections of land, or what particular sections in the whole number; and this fact cannot be ascertained until the company, becoming entitled to select, makes its selections, and the lands are surveyed; and the title does not pass until all this is done and the fees and charges required by law are fully paid.

*J. G. Mohler,* county attorney, for Saline county, and also for defendants Culp and Prescott:

1. The lands were "granted" to the railroad company by the acts of July 1, 1862, and July 2, 1864. Sec. 3 of the act first named says, "that there be and is hereby granted," etc. "A grant of public land, by statute, is the highest and strongest form of title known to our law. It is stronger than a patent, which may be annulled by the judiciary upon a proper case shown; whereas, even congress cannot repeal a statutory grant." Opinions of Attorney General, vol. 11,

the original act, or is limited to the lands acquired by the extension of the grant. Looking to the whole scope of the amended act, and to the provision that the money so paid was to constitute a fund for the continuance and completion of the entire surveys along the road where none had been made, we are of opinion that no patent could rightfully issue in any case until the cost of survey had been paid. None of the road had been built when the amendatory act was passed. No right had vested in any tracts of land, and the power, as well as intent, of congress to require such payment cannot be

page 47. A legislative grant by congress, does of itself, *proprio vigore*, pass to the grantee all the estate which the United States had in the subject matter of the grant, except what is expressly excepted. This principle has often been ruled in the courts: 7 Peters, 51; 9 Peters, 711; 10 How., 442; 12 How., 59; 2 McLean, 412. "The point is firmly settled, if the highest judicial authority can settle anything; and even if there had been no decision of it, I should think it too plain, on original principles, to admit of a doubt. When congress says that a certain portion of the public domain of the United States 'is hereby granted' to a state, what need can there be of any further assurance, in order to give the state a perfect title in fee?" Opinion of Attorney General, June 7, 1857.

2. But it is insisted for plaintiff in error that by the provisions of § 4 of said act of July 1, 1862, a patent must issue before the land ceases to be the property of the government. We take issue on this and say: It is admitted in the agreed statement of facts, that plaintiff, Railway Company, had done everything necessary to be done to entitle it to a patent from the government, except the making the *final entry* required by act of congress approved July 1, 1864, and the payment of $1 per quarter-section, as provided by same act. Hence the Railway Company is in condition to compel title from the government, and consequently the lands in controversy are clearly taxable. 3 How., 441; 4 Wallace, 210; 12 Iowa, 536.

It seems that the plaintiff in error is fearful that in these cases an attempt is being made to tax government lands, and wrest the title and possession of the same from the government. The true question is, not whether we have or not any rights in the lands in controversy, as against the general government, but have we any rights as against plaintiff,

contested. While we recognize the doctrine heretofore laid down by this court, that lands sold by the United States may be taxed before they have parted with the legal title by issuing a patent, it is to be understood as applicable to cases where the *right* to the patent is complete, and the equitable title is fully vested in the party without anything more to be paid, or any act to be done going to the foundation of his right. The present case does not fall within that principle. Two important acts remain to be done, the failure to do which may wholly defeat the right of the company to a patent to these

Railway Company? Plaintiff, in its petition in the court below, necessarily admits its interest in the lands in contro-versy, claiming that it now is the owner of said lands, and it also admits that it acquires all its right, title and interest in and to said lands by virtue of the acts of congress above referred to, passed long previous to the taxation of the lands in controversy. "The right to a patent once vested, is equivalent, as respects the government dealing with the public lands, to a patent issued; and when issued, it relates back so far as may be necessary to cut off intervening claim-ants, *to the inception of the right of the patentee*." 6 Wallace, 402.

3. Selecting, surveying and designating the particular tracts are not necessary to pass the title. The grant is direct and definite—see § 3, act of July 1, 1862, and § 4, act of July 2, 1864. "It is not a good objection to a grant that the metes and bounds were not set forth." 1 Howard, 24. Suppose I sell and convey to a man all the land in a certain designated section in Saline county, that I have not previously sold. Would such a conveyance be void for uncertainty? Manifestly not.

But it is insisted by plaintiff that before title passes from government to plaintiff, Railway Company, it is necessary that plaintiff should pay $1.00 to the Receiver and Register of the local Land Office, as provided for by § 21, act of July 2, 1864. This act cannot be held to apply to the lands involved in the case of defendant Prescott, as said lands were granted to plaintiff by act of July 1, 1862, and said last-mentioned act contains no section authorizing congress, at any time, to alter, amend or repeal said act. "The govern-ment, like an individual, has no power to withdraw or annul its grant of land. The first lawful grant must stand; and the second cannot operate as a conveyance, for the reason that

lands. The first is the payment of the costs of surveying. It is admitted that this has never been done in the present case. If the company have such an interest in these lands that they can be sold by the state under her power of taxation, then the title is divested out of the government without its consent, and the right to recover the money expended in the surveys is defeated. As the government retains the legal title until the company or some other interested in the same grant or title shall pay these expenses, the state cannot levy taxes on the land, and under such levy sell and make a title which

the grantor, when he made it, had no estate to convey."
Opinions of Attorney General, vol. 11, page 47.

The opinion of the court was delivered by

BREWER, J.: Was the land in controversy subject to
taxation, the one parcel for the year 1868, and the other for
the year 1869? This is the only question presented by the
record. The cases were tried in the district court upon an
agreed statement of facts. The plaintiff derived title solely
under the act of congress of July 1st 1862, and amendment
of July 2d 1864, granting aid in the construction of a railroad
and telegraph line from the Missouri river to the Pacific
Ocean. The agreed statement showed that plaintiff was the
owner and in possession at the time of bringing the suit, and
that the tax proceedings were regular and conformed to the
requirements of the statute. It further showed "that at the
time said land was assessed as aforesaid the plaintiff company
had completed the construction of the section of forty miles
of their road within which the land lies, to the approval of
the president of the United States." And in the case against
Culp the agreed facts showed that "said plaintiff at the time
said land was assessed for taxation as aforesaid had not paid
into the treasury of the United States the cost of surveying,
selecting and conveying the said lands, and that no patent
therefor had been issued by the government of the U. S. to
the said plaintiff; that said plaintiff had caused said lands to
be valued and appraised, but that said land had not been
selected and conveyed as provided in said act of congress, nor
the sum of one dollar per quarter-section paid, as provided;
that said plaintiff had done all acts necessary to be done by
it to obtain a patent for said land except as herein before
stated." This quotation from the agreed statement presents
all the facts.

might in any event defeat this right of the federal government reserved in the act by
which the inchoate grant was made.
    Another important and declared purpose of congress would be equally defeated by
the title thus acquired under the tax sale, if it were valid. It is wisely provided that
these lands shall not be used by the company as a monopoly of indefinite duration. The
policy of the government has been for years to encourage settlement on the public lands
by the pioneers of emigration, and to this end it has passed many laws for their benefit.

Was the land taxable? If this land was the property of the Railroad Company, it was taxable; if it was the property of government it was not taxable. Act of Admission, § 3, clause 6th; General Tax Law, ch. 107, § 1. That no patent had issued is immaterial. Lands may be taxable before patent issues: *Carroll v. Safford*, 3 How., 441; *Witherspoon v. Duncan*, 4 Wall., 210; *Stockdale v. Webster County*, 12 Iowa, 536. The patent is evidence of the legal title. Where the right to a patent exists, the government holds the legal title only in trust, and the land is subject to taxation. Had the Railroad Company the right to a patent? If not, what had it to do first, and how did that affect its interest in the land? Sec. 3, of the act of July 1st 1862, provides—

"That there be and is hereby granted to the said company for the purpose of aiding in the construction of said railroad and telegraph line, * * * every alternate section of public land, designated by odd numbers, to the amount of five (changed by the amendment of 1864 to ten) alternate sections per mile on each side of said railroad, on the line thereof, and within the limits of ten (changed by same amendment to twenty) miles on each side of said road, not sold, reserved or otherwise disposed of by the United States, and to which a pre-emption or homestead claim may not have attached at the time the line of the road is definitely fixed; * * * and all such lands so granted by this section which shall not be sold or disposed of by said company within three years after the entire road shall have been completed shall be subject to settlement and pre-emption, like other lands, at a price not exceeding one dollar and twenty-five cents per acre, to be paid to said company.

"Sec. 4. That whenever said company shall have completed forty consecutive miles * * * the president of the United States shall appoint three commissioners to examine the same and report to him in relation thereto; and if it shall appear to him that forty consecutive miles of said railroad and telegraph line have been completed and equipped

This policy not only favors the actual settler, but it is to the interest of those who, by purchase, own adjacent lands, that all of it should be open to settlement and cultivation. Looking to this policy, and to the very large quantity of lands granted by this statute to a single corporation, congress declared that if the company did not sell those lands within a time limited by the act, they should then, without further action of the company, or of congress, be open to the actual settler under the same laws which govern the right of pre-emption on government lands, and at the same price. Any one who has ever lived

in all respects as required by this act, then, upon certificate of said commissioners to that effect patents shall issue conveying the right and title to said lands to said company, on each side of the road, as far as the same is completed, to the amount aforesaid, and patents shall in like manner issue as each forty miles of said railroad and telegraph line are completed, upon certificate of said commissioners."

The agreed statement shows that all the prerequisites to the issue of a patent provided in this section have been performed, and if this were the only section bearing on the question the right to a patent would be clear. As against this right it is objected in the Culp case, first, that the company has not yet paid the one dollar per quarter-section required by the act of July 2d 1864. This is a general act applicable to all grants except those for agricultural colleges, and requires the payment to the register and receiver of a fee of one dollar per quarter-section for each final location. We do not look upon this as attaching a new condition to the grant, a prerequisite to the vesting of title; but only as providing for payment for the evidence of such title. The title passes by the grant and the performance of the conditions named in the grant. To secure the evidence of such transfer of title a fee must be paid to the officers who do the work, or a part of it, of preparing such evidence. It is like the fee paid to the conveyancer for drafting a deed, or to the notary for taking the acknowledgment, or to the register for recording the deed, none of which are paid for the title but only to obtain and perpetuate the evidence of such title. All that the government receives for the land is the construction of the road. This done, its interest in the land ceases. It is no longer its property. The legal title it holds only in trust for the company, and that title it is ready to transfer upon payment of the expenses of making such transfer to the officers who do the work. Again it is objected that the "cost of

in a community where large bodies of land are withheld from use, or occupation, or from sale, except at exorbitant prices, will recognize the value of this provision. It is made for the public good, as well as for that of the actual settler. To permit these lands to pass under a title derived from the state for taxes would certainly defeat this intent of congress. It makes no difference in the force of the principle, that the money paid by the settler goes to the company. The lands which the act of congress declares shall be open to pre-emption and sales are withdrawn from pre-emption and sale by a tax title-

surveying, selecting and conveying the said land" had not been paid into the treasury of the United States. This requirement is found in the 21st section of the act of July 2d 1864, which provides "that before any land granted by this act shall be conveyed  *  *  *  there shall first be paid into the treasury of the United States the cost of surveying, selecting and conveying the same by the said company or party in interest." Substantially the same remarks are applicable here as upon the last point. By the very language of the section this payment is made, not a condition of the grant, but of the execution of the conveyance. The land *granted* shall not be *conveyed*. The right of the company to the land is secured by a performance of the conditions of the grant. The right to a patent or other proper conveyance only by the performance of certain additional requirements. The government after making the grant in effect says, Now if you wish the lines run, and the boundaries of the land granted determined, you must pay the expenses. It demands nothing more for the land, but declines to pay the expenses of making the boundaries and executing the conveyances. Again it is objected that the land had not been selected and conveyed, though it is admitted the plaintiff had valued and appraised it. The term "selection" is not an appropriate one. That carries the idea that the company was authorized to choose from a large body of land a certain number of acres; that the land to be conveyed depended on the choice of the company, and that until such choice no one could ascertain which sections would pass to the company and which remain with the government. We do not so understand the act. The location of the line of the road determined what lands were included in the grant as plainly as though named by section, township and range. Every alternate section designated by odd numbers to the amount of ten alternate sections on

and possession under it, and it is no answer to say that the company which might have paid the taxes gets the price paid by the settler.

For these reasons we think that though the line of the road had been built and approved by the president, so far as to authorize the company to obtain a patent for this land, if they had paid the cost of survey and the expenses of making the conveyance, yet the neglect to do this and the contingent right of offering the land to actual settlers

each side of said railroad, and within the limits of twenty miles, except such as at the time of the location of said line of road the government had sold or guarantied to other parties. All that was to be done embraced under the term "selection," was to ascertain what lands within the limits described yet remained within the absolute control of the government. The grant is equivalent to a conveyance by an individual of all the land in a certain tract which he had not previously sold. Would not the title pass instantly upon such conveyance? Is there any selection to be made prior to the vesting of title in the grantee? The grantee may not know until after examination of the records what portion of the tract he takes under his conveyance, but his examination and ascertainment do not help to pass the title. The cases are parallel. Again it is objected that "the title which the company is entitled to acquire, under the grant, is not an absolute and indefeasible estate." The acts of congress containing this grant provide that all such lands remaining unsold, or undisposed of, by the said companies, three years after the entire road is completed, to aid in the construction of which the grants were made, shall be subject to settlement and pre-emption like other public lands at $1.25 per acre, "the money to be paid to said companies." Counsel very elaborately and ingeniously discuss the difficulties which they suppose may arise in case the company should fail to sell within three years between the future pre-emptor and the holder of a tax-title. But what does the company's deed convey unless it has the title? How can it sell that which it does not own? We do not understand that upon a failure by the company to sell within the three years the lands revert to the government, but simply that after such time the government will have the right to sell it at the ordinary prices of government land, paying the proceeds over to the company. The government receives nothing upon a sale made

at the minimum price asked for its lands by the government, forbid the state to embarrass these rights by a sale for taxes.

The judgment of the state court is therefore reversed, and the case remanded with instructions to proceed in conformity with this opinion.

by it. It only acts as agent. The company is the principal and receives the money. The opinions of the Commissioner of the General Land Office and the Assistant Attorney General of the United States presented as arguments in this case are entirely inapplicable here, as they are based upon facts which by the agreed statement are excluded from our consideration.

In the case of the Railroad Company against Prescott the record presents the same questions as the case of the same plaintiff against Culp, except that it appears from the agreed statement that the cost of surveying, selecting and conveying the land in controversy had been paid at the time the tax proceedings were commenced. This therefore presents a stronger case for affirmance.

The judgment in each case will be affirmed.

All the Justices concurring.