MO. RIVER, FORT SCOTT & GULF RLD. CO. v. C. A. MORRIS,
*Treasurer of Bourbon County.*

1. CHEROKEE NEUTRAL LANDS; *Date of Patent; When Lands subject to Taxation.* By contract with the Secretary of the Interior, Mr. James F. Joy became the purchaser of a tract in southeastern Kansas, known as the Cherokee Neutral Lands. ᵒ By the terms of that contract lands were patented as paid for. Having paid for and received patents for a portion of these lands, in March 1869 Mr. Joy assigned his contract to the plaintiff in error. On the 8th of August, 1870, the plaintiff paid the balance of the purchase-money, and on the 2d of November, 1870, received a patent for the remainder of said lands. *Held,* That these lands paid for on the 8th of August, and patented on the 2d of November, 1870, were not subject to taxation for the year 1870.

2. LANDS GRANTED IN AID OF RAILROADS; *When Lands subject to Taxation.* On the 25th of July, 1866, Congress passed an act entitled "An act granting lands to the state of Kansas to aid in the construction of the Kansas and Neosho Valley railroad, and its extensions to Red river." By the terms of this act, upon the certificate of the Governor of Kansas that any ten consecutive miles of this railroad had been completed, patents were to issue directly to the K. & N. V. Railroad Co. for the lands opposite such completed section, and so for each successive section. No action on the part of the state was in terms called for. The said railroad company, now the Mo. R., Ft. S. & Gulf Railroad Co., as required, formally accepted the grant with its terms and conditions. Prior to 1870 it had complied with all the terms and conditions of the grant required to be performed by it. The state of Kansas took no action in reference to this matter until March, 1871, when the legislature passed a joint resolution formally accepting the grant. No patents had issued for certain of the lands within this grant in Bourbon county up to April 21st, 1871; *held,* that they were nevertheless subject to taxation for the year 1870.

*Error from Bourbon District Court.*

INJUNCTION brought by the *Railroad Company*, to restrain the collection of alleged illegal taxes. The facts are fully stated in the opinion, *infra.* The district court, (E. M. H., judge *pro tem.,* presiding,) at the December Term 1871, refused the perpetual injunction prayed for, and gave judgment against the *Railroad Company* for costs. Said company brings the case here on error.

*C. W. Blair*, and *Wallace Pratt*, for plaintiff:

1. The decision of the supreme court of the United States in the case of *The Kansas Indians*, 5 Wallace, 737, being decisive of the question of exemption from taxation of all lands owned by Indians whose tribal organization was preserved, leaves the only question for solution here to be, whether the legal and equitable title to the lands were in the United States, or the Cherokee tribe of Indians, or in both, at the time of the levy of this tax, or whether the complete equitable title had passed to the plaintiff. It is a matter of history, and familiar to every member of this court, that the "Cherokee Neutral Lands" are a part of the "Louisiana Purchase," acquired by the United States from the French Republic by the treaty of April 30th, 1803, and that, by the second article of the treaty of December 29th, 1835, between the United States and the Cherokee Nation, these lands were ceded to said nation. (7 U. S. Statutes at Large, 478.) By the provisions of this treaty of cession to the Cherokees, the United States government renewed its pledge and guaranty of protection, contained in former treaties with the Cherokee Nation, and also stipulated that these ceded lands should never be included within the territorial limits or jurisdiction of any state or territory, without the consent of said Indians. Afterward, and in August, 1866, another treaty was made and proclaimed between the United States and the Cherokees, the first paragraph of the 17th article of which is as follows:

"ART. 17. The Cherokee Nation hereby cedes, in trust, to the United States the tract of land in the state of Kansas, which was sold to the Cherokees by the United States under the provisions of the 2d article of the treaty of 1835, and also that strip of the land ceded to the nation by the 4th article of said treaty, which is included in the state of Kansas; and the Cherokees consent that said lands may be included in the limits and jurisdiction of said state." (14 U. S. Stat. at Large, 799.)

Counsel for defendant in error, as we understand, admits that the lands were exempt from taxation under the treaty

of 1835, but he asserts that they were so exempt only in pursuance of that provision of said treaty which stipulated that the lands should never be included in the limits or jurisdiction of any state or territory, without the consent of the Indians. From this he deduces the proposition, that consent that the lands be included in the limits and jurisdiction of the state of Kansas having been given by the Indians in the 17th article of the treaty of 1866, above quoted, from that time they were subject to taxation. . We claim that these lands were exempted from taxation by the treaty of 1835, and from any other interference of state or territorial authority, not alone because of the stipulation above referred to, but because they were ceded under the assured protection of the government, and for the purpose of a home for themselves and their descendants, to a nation of Indians which, at the time, kept up, and ever since has preserved its tribal organization; a tribe which has always been recognized by the political and judicial departments of the government as a state, capable of making treaties, managing its own affairs, and subject only to the control of the government of the United States. " The acts of our government plainly recognize the Cherokee Nation as a state, and the courts are bound by these acts." 5 Peters, 15. And see cases of *The Kansas Indians,* 5 Wallace, 537 ; *The Wea Indians,* 5 Wal., 757; *The Miamis,* 5 Wal., 760 ; *The New York Indians,* 7 Wal., 761. And in *Comm'rs of Douglas Co. v. Union Pacific Rly. Co.,* 5 Kas., 615, this court decided, that, "as long as the title to land, lying within an Indian reserve, remained in the United States, or in the Indians, or in both, the land is not taxable by the state." The lands in question in that case were parcel of certain lands ceded by the Delaware tribe of Indians to the United States by the treaty of 1854. Nowhere in that treaty is there any provision exempting the lands so ceded from taxation, nor any provision that they should never be included within the limits or jurisdiction of any state without the consent of the Indians. And see *McCracken v. Todd,* 1 Kas., 148.

2. The plaintiff in error claims that the clause above quoted

from the 17th article of the treaty of 1866 had the effect simply of including the lands in question within the territorial boundaries of the state of Kansas, and in no other respect changed the relative rights of the Indians and said state. The language used in the treaty admits of no other or different construction. The word "jurisdiction" is evidently used, not as descriptive of the power of, or right of exercise of authority by the state, but of the territory to which such power and authority extend. Had the intention been to subject the lands to the jurisdiction of the state, how easy, appropriate, and free from all doubt as to meaning, to have said that they consented that said lands might be included in the limits, and *subject to the jurisdiction of the state of Kansas.*

Again: The object of the Cherokees in ceding these lands to the United States, in trust, was, as article 17 of the treaty plainly indicates and provides, to have them sold and the proceeds applied to the use of the Indians. It is evident that no purchaser could have been found for them, and it is also evident that the United States government would never have consented to a sale of these lands, except possibly to some other tribe of Indians, unless they were, or could be, included in some state or territory. Under the stipulation in the Treaty of 1835, the provisions of the act organizing the territory, and the act of admission of the state of Kansas into the Union, these lands never could have been included in the limits of said state, until the Cherokees should signify their assent to the president of the United States to be so included. Hence the necessity for the clause of assent in the 17th article of the Treaty of 1866. No such necessity existed for any consent on the part of the Indians that these lands should be subject to the laws and jurisdiction of said state. So soon as the same were sold and paid for, and the title of the Indians and the United States government extinguished, these lands became freed from the control of the Federal Government, and at once became subject to the laws of the state of Kansas, and liable to taxation.

Whenever the supreme court of the United States has been

20—13 KAS.

called upon to construe treaties between the government and Indian tribes, it has always adopted rules of interpretation favorable to the Indians; (6 Peters, 582; 5 Wal., 760;) hence there can be no doubt whatever but that our construction must be sustained. No one will seriously claim that it was the *intention* of the Cherokees, in making this treaty, to subject these lands to the jurisdiction and laws of the state of Kansas, and consequently to a liability to taxation. By consenting that they might be included within the boundaries of the state, they did what was absolutely essential to accomplish the object they had in view in making the cession of these lands to the United States, to-wit, a sale at the price specified in the treaty. A further consent that the land should be subject to the laws of the state in nowise aided the accomplishment of this object, because, as we have shown, so soon as they should be sold and paid for, and the rights of the Indians extinguished, precisely this result would be accomplished. Nor could such consent have been of any advantage whatever to the Indians. On the contrary, it would have been greatly to their pecuniary prejudice. No one could tell when these lands would be sold. In fact, they were not sold till about two years had elapsed after the making of this treaty. They might not have been sold for years, and in the meantime the Indians, in order to save their lands from sale for taxes, would have been required to pay a large sum of money annually to the state of Kansas, and for what consideration? Absolutely none.

3. Under the provisions of the contract between the Secretary of the Interior and Mr. Joy, (it is apparent from the agreed statement of facts in this case,) that, at the time of the levy and assessment of the tax in question, the plaintiff in error, assignee of Mr. Joy, had neither the legal nor equitable title to that portion of the neutral lands situate in Bourbon county. The legal title was in the United States, and the equitable in the Cherokees. The plaintiff in error had "a mere contingent, conditional, and inchoate equity," liable to be forfeited by its failure to pay for the same accord-

ing to the terms of the contract of purchase. In the language of Mr. Justice Valentine, in *Parker v. Winsor*, 5 Kas., 373, "The legal title has not passed, because the patent has not yet been issued, and the equitable title has not passed, because it has not yet been paid for, and because it is clearly the intention of the parties, as indicated in the treaty, that such title shall not pass until the land is fully paid for." And again, in *Douglas County v. U. P. Rly. Co.*, 5 Kas., 623, the same Justice says: "The legal title to land never passes until the legal evidence of such title is executed, and the equitable title probably never passes until everything has been done so that the land cannot be forfeited." It would be difficult to frame a contract in which "time" should be made more of its essence, than in the one under which these lands were purchased, or one in which the rights of the Indians could have been more carefully guarded. No right of possession was given to the purchaser, thus avoiding the acquiring of an equity by the making of improvements upon the lands. Equally was the claim of an equity, based upon part payment, guarded against, by providing that whenever the sum of $50,000 or more of principal should be paid, the government would set off and patent to the purchaser a number of acres corresponding to the number of dollars so paid. As appears from the agreed statement of facts, this provision of the contract was faithfully observed; so that, at the time of the levy of the tax in question, the government had not received one single dollar from the purchaser, for which it had not conveyed to him a corresponding acre of these lands.

4. The lands mentioned in the second cause of action of the petition, at the time of the levy of the tax against them, were the property of the United States, and as such exempt from taxation by the state of Kansas. These lands are parcel of a grant by the United States to the state of Kansas, for the use of the plaintiff in error, by an act of Congress, entitled "An act granting lands to the state of Kansas to aid in the construction of the Kansas & Neosho Valley Railroad and its extensions to Red river," approved July 25th, 1866.

By this act certain conditions were imposed upon plaintiff in error. One provided for a formal acceptance of the terms and conditions of the grant by the railroad company within one year; another prescribed the kind of road that should be built; and another, that the railroad company should not dispose of or incumber the lands so granted under the provisions of said act. It is admitted that plaintiff in error, (then the Kansas & Neosho Valley Railroad Company,) at the time of the levy of the tax against these lands, had complied with all of the conditions of the grant on its part to be performed. It is also admitted that the state at that time had not accepted and did not accept such grant until the 2d of March, 1871, when a formal resolution was passed by the legislature of the state accepting the same. We claim that, notwithstanding such compliance on the part of the plaintiff in error with all of the conditions of this grant, no such complete, equitable title to the lands in question had passed to it at the time of the levy of this tax, as to entitle it to a conveyance by the United States of the legal title, but that this equitable title, as well as the legal, still remained in the United States — because, 1st, there had been no acceptance of the grant by the state of Kansas. This grant was made directly to the state of Kansas, for the use of the plaintiff in error, thus constituting the state the trustee, and the railroad company the *cestui que trust*. In all deeds or grants, made directly to a trustee for the use of another, there must be some sort of an acceptance by the trustee in order to make such deed or grant operative; and no presumption of acceptance can obtain where the state is named as trustee unless there has been some action of its legislative department, through which alone the state can act, indicating at least a knowledge on their part of the terms and conditions of such deed or grant. 2d, The United States, in prohibiting the railroad company from disposing of or incumbering these lands until the patent should be given it under the provisions of the grant, clearly and unmistakably show, that it was their intention that no interest whatever in these lands

should pass to the railroad company until these patents had been executed, but that the entire equitable, as well as the legal, title should remain in the United States. At the time of the levy of this tax, no patent for any of these lands had been made, and hence no such interest in them had passed from the United States to the railroad company as to render them liable to taxation by the state. Act of Admission, § 2, subdiv. 6; 5 Kas., 362, 615.

*W. J. Bawden,* for defendant in error:

1. The entire equitable and beneficial interest and title to said neutral lands were at the time of the levy of taxes thereon for 1870, and since the year 1868 had been, vested in the plaintiff in error, or its grantor, James F. Joy. Plaintiff in error contends that said lands were exempted from taxation by the Organic Act and Act of Admission until the consent of the Indians should be obtained, and that the consent given in the 17th article of the treaty of 1866 "had the effect simply of including these lands in the boundaries, and making them subject to the process of the courts of the state of Kansas." Is this a fair deduction? The second proviso of the Organic Act provides that nothing in said act shall be construed "to include any territory, which by treaty with any Indian tribe is not, without the consent of said tribe, to be included within the territorial limits or jurisdiction of any state or territory, but all such territory shall be excepted out of the boundaries and constitute no part of the territory of Kansas, until said tribe shall signify their assent to the president of the United States to be included within the said territory of Kansas." (Gen. Stat. 1868, p. 26.) In § 1 of the Act of Admission (Gen. Stat., 67,) the identical words are used as above quoted, with the exception that the word "state" is substituted for "territory," and the word "such" for "any." This then is the law, if any there be, under which these lands are exempted from taxation, because they are not included within the *territorial limits or jurisdiction of the state of Kansas.*

What is the language used in the treaty which the plaintiff in error claims had the effect simply of including these lands within the boundaries of the state and making them subject to the process of the courts thereof? In article 17 of the treaty of August 11, 1866, are these words, "And the Cherokees *consent* that said lands may be included in the limits *and jurisdiction* of the said state." If the *excluding* of these lands from the limits and jurisdiction of the state, prohibits the state from taxing the same, until consent is given by the Indians, then consent given by said Indians that said lands may be *included* in the limits and jurisdiction of the state, removes the prohibition.

But the treaty of 1866 not only removed the prohibition imposed by the Organic Act, and the Act of Admission, but it went further; it made the United States the trustee of the Cherokee Nation for the sale of said lands, and authorized the Secretary of the Interior, acting for the United States, "to sell such lands to the highest bidder." It is admitted in the agreed statement of facts, "that in pursuance of the provisions of said article 17 of said treaty, as amended by the United States Senate, and of a supplemental article thereto, ratified June 6th, 1868, James F. Joy, on the 8th of June 1868, entered into a contract, in writing, with O. H. Browning, then Secretary of the Interior Department of the United States for the purchase of said lands; that on or about the first day of March 1869, said James F. Joy *assigned and conveyed* to the plaintiff all of his right, title and interest in and to said contract of the date of June 8th, 1868." Did not the contract of James F. Joy with the Secretary of the Interior confer an equitable title upon said Joy? If not, what office did the contract perform? It is not claimed that there were any special conditions incorporated in said contract, and the presumption is that the contract was such as is usual for the sale of land; and in fact, the contract itself shows that no conditions were imposed, that it was an ordinary contract for the sale of land, in which the grantor uses the words "agrees to sell and *hereby doth sell*," etc. It is a well-settled princi-

ple, that equity considers, where land is sold on credit, and the deed is to be made when the purchase-money is paid, that the land at the time of the purchase becomes the vendee's, and the purchase-money the vendor's; that the vendor becomes the trustee of the vendee with respect to the land, and the vendee the trustee of the vendor with respect to the purchase-money. (2 Johns., 595; 6 Barb., 481; 7 Ohio, 2d pt., 73 – 81; Washburn on Real Prop., 424, 426.) In the case of *Parker v. Winsor*, 5 Kas., 369, cited by plaintiff, the treaty under which the sale, to the U. P. Rly. Co., was made provides that "none of said lands shall be subject to taxation, until the patents have been issued therefor;" but in the treaty under which the sale was made in the case at bar, "the Cherokees consent that said lands may be included in the limits and jurisdiction of the said state." In *Parker v. Winsor*, the court says, "but in this case, neither the legal nor equitable title has passed; the legal title has not passed, because the patent has not yet been issued; and the equitable title has not passed, because it has not yet been paid for, and because it is clearly the intention of the parties, as indicated in the treaty, that such title shall not pass until the land is fully paid for." And the same principle was decided in *Comm'rs of Douglas Co. v. U. P. Rly. Co.*, 5 Kas., 615. In the case at bar there is no such intention expressed or implied, and no such conditions imposed. If the equitable title did not pass *because* of the provisions of that treaty and the intention of the parties that it should not pass, then by a parity of reasoning, in the case at bar, when no such intention and no such provisions exist the equitable title did pass.

2. As to the taxes sought to be enjoined in the second count in plaintiff's petition, their validity would seem to be settled by the agreed statement of facts. It is true, that the act granting the lands to the plaintiff in error did impose some conditions upon said railroad company, but it is agreed that said plaintiff in error had, at the time of said levy, "complied with *all* the conditions of said grant, on its part to be performed," leaving nothing but the naked legal title in the

United States. The plaintiff company then had accepted the grant within one year after the passage of said act, and prior to July 25th, 1867; and upon the acceptance thereof the equitable title passed to the plaintiff in error. There is no provision which makes it necessary that the state of Kansas should accept the trust.

The opinion of the court was delivered by

BREWER, J.: The plaintiff in error filed its petition in the district court of Bourbon county against the defendant in error to enjoin the collection of a tax levied in the year 1870, against certain real estate of the plaintiff, and containing two causes of action. The first is to enjoin a tax, amounting to about $10,000, levied against that portion of the "Cherokee Neutral Lands" lying in Bourbon county, and to which the plaintiff acquired title by patent from the United States bearing date November 2d, 1870. The petition alleges, that, at the time of the levy of this tax, the plaintiff had neither the legal nor equitable title to these lands, but that they were in the U. S. government and the Cherokee tribe of Indians, and hence the lands were exempt from taxation. The second cause of action is to enjoin the collection of a tax levied against certain lands granted by the U. S. government to the state of Kansas to aid in the construction of the railroad of the Kansas and Neosho Valley Railroad Company, (the former corporate name of the plaintiff,) by an act of congress approved July 25th, 1866, which grant had not been accepted by the state of Kansas at the time of the levy of said last-mentioned tax. The facts were agreed between the respective parties, and are contained in a written stipulation on file herein, which, by order of the court below, was made a part of the record. The court below found for the defendant, and rendered judgment accordingly. The facts contained in the stipulation above referred to, and the exhibits thereto attached, relating to the first cause of action, are as follows:

1st, That the lands mentioned in the first cause of action in the petition, are a part of the "Cherokee Neutral Lands,"

so-called, and the same mentioned in the first part of article 17 of the Treaty between the United States and the Cherokee Nation of Indians, proclaimed August 11, 1866.

2d, That, in pursuance of the provisions of article 17 of said Treaty, as amended by the United States Senate, and a supplemental article thereto, ratified June 6, 1868, James F. Joy, on the 8th of June, 1868, entered into a contract with the then Secretary of the Interior Department of the United States for the purchase of said "Cherokee Neutral Lands;" by the terms of which contract, Mr. Joy was to pay for the same to the Secretary of the Interior, as trustee for the Cherokee Nation of Indians, at the rate of one dollar per acre, as follows: Within ten days, the sum of $75,000; $75,000 on the 30th days of August, 1868, 1869, and 1870, respectively; and $100,000 per annum thereafter, until the whole purchase-money should be paid. It was further agreed, in and by said contract, that the United States should cause said lands to be surveyed as public lands were usually surveyed, and, on the payment by Mr. Joy of $50,000, to set apart for him a quantity of said land in one body, in as compact form as practicable, extending directly across said lands from east to west, and containing a number of acres equal to the number of dollars thus paid, and from time to time to convey the same by patent to said Joy, whenever requested so to do, in such quantities, and by legal subdivisions, as said purchaser should indicate; and, on the payment of each additional installment, with interest, as therein stipulated, to set apart for said purchaser an additional tract of land, in compact form, when the said purchaser might request, but extending directly across the neutral lands from east to west, containing a number of acres equal to the number of dollars of principal thus paid; and to convey the same to said purchaser, or his assigns; and so on from time to time until the whole should be paid; and no conveyance of any part of said lands to be made until the same should have been paid for as provided for in the said contract.

3d, That on or about the 1st of March, 1869, Mr. Joy assigned and conveyed to the plaintiff all his right, title and interest, in and to said contract, and to the lands therein described.

4th, That prior to said 1st of March, 1869, Mr. Joy had paid to the Secretary of the Interior portions of the purchase-money for said lands, and had received from the United States patents for a corresponding number of acres of the same, set

apart for him in pursuance of the provisions of said contract; but that no part of the said "Cherokee Neutral Lands" situate in Bourbon county was included in said patents.

5th, That on the 8th of August, 1870, the plaintiff, as such assignee of Mr. Joy, paid to the Secretary of the Interior, the sum of $437,478.50, the balance of the principal and interest then due and unpaid upon said contract, after deducting the payments so as aforesaid made by Mr. Joy; and, on the 2d of November, 1870, received from the United States a patent, conveying to said plaintiff the balance of said "Cherokee Neutral Lands," not so as aforesaid patented to Mr. Joy, and including in said patent that portion of said lands situate in Bourbon county.

6th, That in September, 1870, there was levied and assessed against said lands in Bourbon county, and by the proper officers of said county, the tax mentioned in the first count of plaintiff's petition, and that the same, with the statutory penalty of ten per cent., is in the hands of the defendant for collection.

7th, That the Cherokee Indians retained at the time of the levy of this tax, and still retain their tribal organization and national existence.

It seems from this agreed statement that the only interest the plaintiff had in these lands, at the time of the levy and assessment of the tax, was derived from a contract of purchase upon which no portion of the purchase-money had been paid. For while the contract provided for the sale of the entire 800,000 acres, and some money had been paid thereon, yet it also provided for the conveyance of the land as rapidly as paid for, acres for dollars; and all the land paid for had been in fact conveyed by patent prior thereto. Of course, the government had no lien upon the lands patented for the purchase-money of those unpatented; and the plaintiff had no right to a conveyance of the latter until it had paid therefor the contract-price of a dollar per acre. There was therefore but a simple contract of purchase, upon which the purchaser had paid nothing. The legal title was in the government, and while the plaintiff had an equitable interest in the land, it had not the full equitable title. If these lands had been public lands, beyond any question, under the recent

decision of the supreme court of the United States in the case of the *Kansas Pacific Rly. Co. v. Culp*, (17 Wall.,) reversing the decision of this court, (9 Kas., 38,) they would not have been subject to taxation. In that case the court says: "While we recognize the doctrine heretofore laid down by this court, that lands sold by the United States may be taxed before they have parted with the legal title by issuing a patent, it is to be understood as applicable to cases where the *right* to the patent is complete, and the equitable title is fully vested in the party without anything more to be paid, or any act to be done going to the foundation of his right." But these were not public lands. The government held the legal title, but held it in trust for the Cherokee Indians. These Indians still retained their tribal organization and national existence. As such their property was exempt from state taxation. In the case of *The Kansas Indians*, (5 Wall., 737,) the supreme court decided that "as long as the United States recognizes their national character they are under the protection of treaties and the laws of Congress, and their property is withdrawn from the operation of state laws." The same doctrine was recognized in the subsequent case of *The New York Indians*, (5 Wall., 761.) These decisions were placed not simply or mainly on treaty stipulations, but upon the broad ground that these Indian nations were under the protection and care of the general government, were separate nations, and outside the jurisdiction of the states. Speaking of the Shawnees Mr. Justice Davis uses this language: "If the tribal organization of the Shawnees is preserved intact, and recognized by the political department of the government as existing, then they are a people distinct from others, capable of making treaties, separated from the jurisdiction of Kansas, and to be governed exclusively by the government of the Union." So that whether these lands were the property of the United States, or the Cherokee Nation, they were alike exempt from taxation. But there remains a more difficult question. These lands were originally ceded to the Cherokees by the treaty of December 29th, 1835. (7 U. S. Stat., 478.) By that treaty

it was stipulated that these lands should never be included within the limits or jurisdiction of any state or territory without the consent of said Indians. By the treaty of 1866 they were ceded by the Cherokees to the United States. (14th U. S. Stat., 799.) The 17th article of that treaty is, so far as it bears upon the question, as follows:

"ART. 17. The Cherokee Nation hereby cedes, *in trust*, to the United States the tract of land in the state of Kansas, which was sold to the Cherokees by the United States under the provisions of the 2d article of the treaty of 1835, and also that strip of the land ceded to the nation by the 4th article of said treaty, which is included in the state of Kansas; and the Cherokees consent that said lands may be included in the limits and jurisdiction of said state."

Upon this, counsel for defendant in error contends that the Cherokees, who at the time of this tax were the sole beneficiaries of this trust, the owners of the full equitable interest, subject only to the plaintiff's right of purchase, a nation not occupying these lands, but domiciled outside the territorial boundaries of the state, had consented that the lands should become a part of the state, and subject to all its laws, including its revenue and tax laws. If the Indians consented, who could object? The restraints of the organic act and the act of admission were abrogated by this stipulation, and thereafter the authority of the state was full and absolute over the lands. It cannot be denied that there is great force in this argument. But it must be borne in mind that it is settled law to construe Indian treaties liberally in favor of the Indians. As said by Mr. Justice Davis, "Enlarged rules of construction are adopted in reference to Indian treaties." And by Chief Justice Marshall, in 6 Peters, 582: "The language used in treaties with the Indians shall never be construed to their prejudice, if words be made use of which are susceptible of a more extended meaning than their plain import, as connected with the tenor of their treaty." Now the purpose of this cession might be defeated, and would certainly be hindered, if from the very date of the treaty, and before the government had effected any sale, the state could burden these

lands with its taxes, and subject them to sale for nonpayment. No benefit would inure to the Cherokees by making them subject to taxation prior to a sale. The lands would be less rather than more salable. And we cannot suppose they intended to insert a stipulation which would throw a burden upon their property, and for which they receive no consideration. It seems to us rather that they intended simply to do away with the prior stipulation of exclusion, leaving the lands, as other Indian lands to which such a stipulation of exclusion had never attached, under the protection of the general government until such time as the latter should effect a sale. From these considerations it follows that these lands were not subject to taxation for the year 1870, and the tax proceedings should be perpetually enjoined.

II. In regard to the lands in question in the second cause of action, it is agreed in the statement of facts that they are a part of certain lands granted to the state of Kansas by a certain act of Congress approved July 25th, 1866; that the plaintiff in error had, at the time of the levy of the tax complained of, complied with all the conditions of said grant on its part to be performed; that the state of Kansas had not at the time of said levy accepted said grant, and never did accept the same until the 2d of March, 1871. Referring to the act of Congress, it appears from the first section that the grant of lands was to "the state of Kansas for the use and benefit of said railroad company," (the plaintiff herein.) By the third section it was provided that "when the governor of the state of Kansas shall certify that any section of ten consecutives miles of said road is completed in a good, substantial and workmanlike manner as a first-class railroad, then the said secretary of the interior shall issue to the said company patents for so many sections of the land within the limits above named as are co-terminous with the said completed section hereinbefore granted," (and so for each successive section of ten miles:) "*Provided*, that if said road is not completed within ten years from the date of the acceptance of the grant hereinbefore made, the lands remaining unpatented shall re-

vert to the United States; *and provided further*, that the said
lands shall not in any manner be disposed of or incumbered
by said company or its assigns, except as the same are patented
under the provisions of this act." Section seven requires
that the acceptance of the company shall be in writing, and
made within one year. These are all the provisions of the
act that bear upon the question. It is agreed that no patent
had been issued for these lands up to the time of commencing
this action. Upon these facts counsel for plaintiff in error
say—we quote from their brief:

"We claim that, notwithstanding such compliance on the
part of the plaintiff in error with all of the conditions of this
grant, no such complete, equitable title to the lands in ques-
tion had passed to it at the time of the levy of this tax, as to
entitle it to a conveyance by the United States of the legal
title, but that this equitable title, as well as the legal, still
remained in the United States: *First*, Because there had been
no acceptance of the grant by the state of Kansas. This
grant was made directly to the state of Kansas, for the use
of the plaintiff in error; thus constituting the state the trustee,
and the railroad company the *cestui que trust*. *Second*, Because
the United States, in prohibiting the railroad company *from
disposing of or incumbering these lands until the patent should
be given it under the provisions of the grant*, clearly and unmis-
takably show, that it was their intention that no interest what-
ever in these lands should pass to the railroad company until
these patents had been executed, but that the entire equitable,
as well as the legal title should remain in the United States."

It does not seem to us that either point is well taken. The
case comes within the rule as laid down by Mr. Justice Miller
in the case from 17th Wallace, just cited, "where the right
to the patent is complete, and the equitable title is fully vested
in the party without anything more to be paid, or any act to
be done going to the foundation of his right." While the
grant is in terms to the state for the use of the company, the
act calls for no acceptance from the state, and provides for the
issue of patents directly to the company, and specifies the con-
ditions of the issue. Those conditions involve no action on
the part of the state, for while patents were to issue on the

certificate of the governor, this was simply a provision on the part of the United States government to secure satisfactory evidence of the performance by the company of the conditions of the grant before a conveyance of the lands. The company had nothing more to pay, nothing more to do. It had complied with the conditions of the grant. Nothing remained, unless perhaps it were the evidence of such compliance. There was certainly nothing that went to the "foundation of its right." Nor do we think the restriction on the company's disposal of the land a restriction on the right of taxation. The government retained by it no interest in the land. The equitable interest of the company was in nowise limited. It was a naked restriction on the right to dispose or incumber. There is no reason for making it the basis of an exemption from taxation. We see no error in the ruling of the district court upon this point.

The case having been tried upon an agreed statement of facts, it is the duty of this court to direct what judgment shall be entered by the district court. The case will be remanded, with instructions to enter a judgment in favor of the plaintiff in error, enjoining and restraining all proceedings to collect the taxes for the year 1870 on the lands described in the first cause of action set forth in the petition, and for costs of suit. The costs of this court will be divided.

All the Justices concurring.