JOHN D. BROWN, *et al.*, v. BOSTON STEELE, *et al.*

SHAWNEE LAW *of Descents.* Nancy Bluejacket, *alias* Wah-na-se, was a reservee and patentee under the treaty with the Shawnee Indians of May 10, 1854. She occupied the land patented to her in Wyandotte county until her death in 1876. She was never married, and her nearest blood relations at the time of her death were the plaintiffs, children of a deceased sister, and Mary Rogers, under whom the defendants claim, the daughter of a deceased brother. By the Kansas law of descents, plaintiffs and defendants would share equally in the property; but by the Shawnee law, as the father of the plaintiffs was a Wyandotte, while both parents of Mary Rogers were Shawnees, the latter inherited the whole, to the exclusion of the plaintiffs. Her right to so inherit was also affirmed by a decision of the Shawnee council. *Held*, That it appearing that the tribal organization was still recognized by the political department of the United States government, under the decision of the supreme court of the United States in the case of *The Kansas Indians*, 5 Wall. 737, the descent is cast, not under the Kansas law, but in accordance with the Shawnee law and decision.

### *Error from Wyandotte District Court.*

BROWN, and four others, claiming to be the owners of an undivided half-interest in certain lands in Wyandotte county, brought this action against *Steele*, and three others, to assert such right. Trial at the July Term, 1878, of the district court, and judgment for the defendants. New trial denied, and the plaintiffs bring the case here. The facts sufficiently appear in the opinion.

*J. B. Scroggs, H. L. Alden*, and *D. B. Hadley*, for plaintiffs in error.

*Nelson Cobb*, and *Holmes & Dean*, for defendants in error.

The opinion of the court was delivered by

BREWER, J.: Plaintiffs, claiming to be the owners of an undivided half-interest in a tract of land in Wyandotte county, brought their action in the district court of that county to assert that right. The case was tried by the court, without a

jury.   A general finding and judgment were for defendants, and plaintiffs allege error.

The facts are these: The land was patented to Nancy Bluejacket, a Shawnee Indian, whose Indian name was Wahna-se, and patented under the treaty of May 10, 1854.   She died unmarried, and both parties hereto claim to be the heirs, or to hold under heirs.   The plaintiffs and Mary Rogers, under whom defendants claim, bore the same blood relationship to her, the plaintiffs being the children of a sister, and Mary Rogers the daughter of a brother.   Under the Kansas law of descents, the plaintiffs would share equally with Mary Rogers in the inheritance.   But it also appears that the mother of plaintiffs was married to a Wyandotte, and lived with that tribe, and that her husband, the father of plaintiffs, received land and annuities as a member of that tribe, while the father and mother of Mary Rogers were both Shawnees.   In other words, Mary Rogers was a full-blooded Shawnee, and plaintiffs were half-bloods only.   It further appears that in 1868 the Shawnee council established a rule of descents, which would cast the entire inheritance upon members of the tribe to the exclusion of all others, and that after the death of Nancy Bluejacket, they declared that Mary Rogers was her sole heir.   In other words, the case stands thus: If this land descended in accordance with the Kansas law of inheritance, plaintiffs are entitled to recover; if by the law of the Shawnee nation, they have no interest in the property.   Which law prevails?   We think this question is fully answered by the decision of the supreme court of the United States, the court of last resort in such questions, in the case of *The Kansas Indians*, 5 Wall. 737, a case which went up on error from this court, and in which the treaty of 1854, under which this land was patented, was the very matter under consideration.   In that case the court says:

"The treaty of 1854 left the Shawnee people a united tribe, with a declaration of their dependence on the national government for protection, and the vindication of their rights. Ever since this, their tribal organization has remained as

43—23 KAS.

it was before. They have elective chiefs, and an elective council, meeting at stated periods, keeping a record of their proceedings, with powers regulated by custom, by which they punish offenses, adjust differences, and exercise a general oversight over the affairs of the nation. This people have their own customs and laws, by which they are governed. Because some of those customs have been abandoned, owing to the proximity of their white neighbors, may be an evidence of the superior influence of our race, but does not tend to prove that their tribal organization is not preserved. There is no evidence in the record to show that the Indians with separate estates have not the same rights in the tribe as those whose estates are held in common. Their machinery of government, though simple, is adapted to their intelligence and wants, and effective, with faithful agents to watch over them. If broken into, it is the natural result of Shawnees and whites owning adjoining plantations, and living and trafficking together as neighbors and friends. But the action of the political department of the government settles, beyond controversy, that the Shawnees are as yet a distinct people, with a perfect tribal organization. Within a very recent period, their head-men negotiated a treaty with the United States, which, for some reason not explained in the record, was either not sent to the senate, or, if sent, not ratified, and they are under the charge of an agent who constantly resides with them. While the general government has a superintending care over their interests, and continues to treat with them as a nation, the state of Kansas is estopped from denying their title to it. She accepted this *status* when she accepted the act admitting her into the Union. Conferring rights and privileges on these Indians cannot affect their situation, which can only be changed by treaty stipulation, or a voluntary abandonment of their tribal organization. As long as the United States recognizes their national character, they are under the protection of treaties and the laws of congress, and their property is withdrawn from the operation of state laws."

This decision was in 1866. Since then it is not pretended that there has been any treaty changing their relations to the government, or releasing tribal control of persons or property. Unless, then, within that decision, there has been a voluntary abandonment of tribal organization, (and that question is one to be conclusively settled by the political department of the

government,) the Shawnee law of descents and the decision of the Shawnee council are final and conclusive against the plaintiffs' rights. That the question of the continuance of the tribal organization is one for the decision of the political department of the government, is also affirmed in *United States v. Holliday*, 3 Wall. 419, where Mr. Justice Miller, speaking for the court, uses this language: "The facts in the case . . . show distinctly that the Secretary of the Interior and the commissioner of Indian affairs have decided that it is necessary, in order to carry into effect the provisions of said treaty, that the tribal organization should be preserved. In reference to all matters of this kind, it is the rule of this court to follow the action of the executive and other political departments of the government, whose more special duty it is to determine such affairs. If by them those Indians are recognized as a tribe, this court must do the same." (See also *Gulf Rld. Co. v. Morris*, 13 Kas. 315.)

It appears that sometime in 1872 the bulk of the Shawnee tribe moved away from Kansas, to the Indian territory, and occupied a part of the Cherokee reservation; that since then the government has had no separate agent for that tribe, and that they have not only been domiciled among the Cherokees, but to some extent under the control of the Cherokee council and united with the Cherokees. As one witness expressed it, "The Cherokee laws govern us as to general police regulations and crime. The Shawnee council act as to ownership of property." If the question were one of fact for original determination in the courts, it might be difficult to hold from the testimony, that a distinct, independent tribal organization remained. But, as we have seen, that question is for the political branch of the government, and the courts follow its ruling. Now it appears that the agent for the Cherokees acts as agent for the Shawnees; that he convenes their council; that that council acts upon questions of property and heirship, and that its acts thereon are received and recognized in the interior department at Washington; and that since the decease of Nancy Bluejacket and the decision of the

council as to the inheritance of her property, and about the time of the trial of this case in the district court, the interior department promulgated rules and regulations for the conveyance of Shawnee Indian lands in this state, in which the existence of the tribe and the power of its chiefs are distinctly recognized. Under those circumstances, it is not for the courts to say that the tribal organization has been abandoned. Though the tribe may have dwindled in numbers, though its chief domicile may have been changed, though for many purposes it may have been merged into some other tribe, yet so long as the government recognizes its tribal existence and a tribal control of persons and property, such recognition is conclusive upon the courts. This is the substantial question in the case, and the ruling of the district court was correct.

The judgment will be affirmed.

All the Justices concurring.

VALENTINE, J.: I think the foregoing opinion follows the decision of the supreme court of the United States in the case of *The Kansas Indians*, 72 U. S. (5 Wall.) 737, and that the opinion is right if the decision which it follows is right; therefore I concur.