## S. D. LEONARD v. A. D. ROSS.

HOMESTEAD; *Statute Construed; Land, When not Exempt.* Where a person is, on May 19, 1874, occupying a piece of land under the provisions of the act of congress enabling actual settlers to secure homesteads on the public domain, (12 U. S. Stat. at Large, 393; U. S. Rev. Stat. 423,) and on that day pays his money for his land, under section 8 of said homestead act, thus commuting residence by the payment of money, *held,* that the said homestead act will not exempt said land from the payment of debts contracted by said person after that time, although the patent for the land may not be issued for several months afterward.

### Error from Harvey District Court.

INJUNCTION brought by *Ross* against *Leonard,* sheriff of Harvey county, to enjoin the sale of certain land claimed by plaintiff as his homestead. The nature of the action and the facts appear in the opinion. Trial at the March Term, 1878, of the district court, and judgment for the plaintiff. The defendant brings the case to this court.

*John Reid,* and *A. L. Williams,* for plaintiff in error:

Is an official bond a "debt" within the meaning of the homestead act? Blackstone (Book 3, p. 154) defines "debt" as follows:

"The legal acceptation of debt is a sum of money. due by certain and express agreement, as by a bond for a determinate sum, a bill or note, a special bargain, or a rent reserved on a lease, where the quantity is fixed and specific and does not depend upon any subsequent valuation to settle it."

In all the rapid changes which have taken place in the common law, we may look in vain for any change in this definition. With this fixed meaning, then, unchanged for so many years, we may safely assume that congress used the word "debt" knowingly, and with the intention of giving it its common-law meaning. If it was thus used, it is very plain that an *official bond* is not a *debt* at the time it is signed. When Ross signed this bond, there was no "money due" from him to the obligee of the bond "by certain and express agreement." The undertaking was not "a bond for a determinate sum," as stated in this definition. He was not in debt to the state, the county, or to any of its subdivisions; for his undertaking had special reference to the future, the giving of which was in fact an essential prerequisite to the entering upon the duties which alone could make it possible to create a liability. He not only was not indebted to the obligee when he signed the bond, but the presumption of law was that he would not become liable, as all officers are presumed to do their duty. It was at most an undertaking that if a

"debt" were created in the future by the misconduct of the treasurer, which was not paid by the treasurer, he would pay it when it had been properly shown to exist. (46 Ala. 53; 3 Bankruptcy Register, 430, 426; 2 American Law Times, 168; 2 Chicago Legal News, 49; 16 Pittsburgh L. J. 233.) All legislatures know the distinction between a "debt" and an instrument of this kind. Congress must have known that by the use of some such general terms as "obligation," or "liability," it could have included all forms of debt, while by the use of the technical term "debt" it could not include all forms of "obligations" and "liabilities." It seems very plain, then, that congress only meant to exempt the homestead from liability for a "debt" as known to the common law.

Assuming that the signing of the bond was not contracting a "debt," when, if ever, was it contracted—when the breaches actually occurred, when the suit was brought, or when the judgment was rendered? If it was contracted when the breaches occurred, it becomes material to inquire whether the land became liable to execution when final proof and payment were made, or when the patent issued. The breaches occurred between November 5, 1872, and October 12, 1874. There is nothing in the record fixing any definite time, nor any specific breach. They cover a time both prior and subsequent to the making of final proof, and it is very clear that the party claiming the exemption takes upon himself the burden of showing the facts entitling him thereto. He must show specifically, that the judgment was founded upon a breach existing before his land became liable to seizure. In this case he has failed to do so, and the court must fix the last date mentioned, October 12, 1874, as the time of the breach of the bond; and at that time he had done everything necessary to entitle him to his patent, by making proof and payment under the 8th section of the homestead act. That the land is subject to execution as soon as the party becomes entitled to a patent, has been settled for years, and is the law of this case, unless there is something in the law itself to vary the rule laid down by the courts. (3 How.

441; 4 Wall. 210; 9 Kas. 38.) And that he is entitled to his patent without any further steps when he has made such proof and payment, is evident on principle, and sustained by authority. Is there anything in the homestead act varying this rule? If there is, it is found in the section exempting property from seizure for debts contracted prior to the issuance of the patent. In regard to that, we have only to say, that it applies only to homesteads that are given at the end of five years' occupancy, and not to those that are purchased, and that when the right to a patent becomes absolute, the power of the United States over the land ceases, and the law regards the homesteader as in fact having a patent. (4 Wall. 210; 4 How. 17; 3 How. 441; 6 Wall. 402.)

Under the homestead act a man acquires his land either by occupancy for five years, or by purchase. When he takes by purchase, his homestead entry is considered canceled, and he takes under the preëmption laws. Now if he takes under the preëmption law, it is conclusively settled in *Thompson v. Levi*, (4 How. 17,) that his land is subject to execution whenever he makes final proof and payment. If, however, the court should be of the opinion that the land is only liable for debts contracted subsequent to the actual issuance of the patent, it remains to inquire when this debt was contracted, when the bond was signed, when the breach occurred, or when judgment was obtained? We have already tried to show that signing the bond was not contracting a *debt* within the meaning of the act of congress; and if we are correct in that, it follows of necessity that Ross contracted no debt until it had been decided by proper authority that the treasurer was indebted to some one. The undertaking of Ross was, that if at any time in the future the treasurer became indebted to the state, the county, or to any of its subdivisions, and failed to pay, then he (Ross) would, as soon as the amount of the debt and the person to whom it was due were determined. It would then become a *debt* of Ross — a fixed and determinate sum due to a certain person. The existence of these facts can be determined either — first, by a settlement of the treasurer

with the various corporations, showing the exact amount of his indebtedness to each; or, second, a judgment at law establishing the amount. In this case the amount owing by the treasurer was established in the second way, and then, and not until then, *i. e.*, upon the rendition of the judgment, became a *debt* of Ross.

*C. S. Bowman*, for defendant in error:

We agree with counsel for plaintiff in error in the statement of the case, and the questions which they ask, but not in their answers. They insist that Blackstone's definition of "debt," when applied to a common-law form of action, is all the meaning that congress intended to be extended to the word, to wit: "Money due by certain express agreement . . . for a determinate sum." Surely it must be *due* when used and applied as a remedy to recover, but it may be used and is universally so used to express any liability, obligation or indebtedness due or to become due in the future. It is fair to presume that when congress used the word "debt," it attached to it such meaning as is commonly and ordinarily accepted by men, to' wit, any obligation contracted or incurred. Bouvier, in his Law Dictionary (4th ed.), p. 379, says of the word "debt": "In a still more enlarged sense it denotes any kind of a just demand," and cites 4 S. & R. 506. In his 14th edition, p. 437, he also defines it to be, "all that is due a man under any form of obligation or promise," and cites 3 Metc. (Mass.) 522. Congress also employs the word "debt" in the bankruptcy act, and surely does not only mean thereby "money due by certain express agreement . . . for a determinate sum," but debts to become due at a future time as well, and in many instances uses the term "debt" for unliquidated damages arising and sounding in tort. Other law-makers use the same term in various acts of legislation in its extended and enlarged sense, such as debts due the estate, debts of the estate, debts of the decedent, etc.

We might suggest for the benefit of opposite counsel, that older and more ancient law-givers, expounders and teachers

than Blackstone, used and employed the word "debt" in its enlarged sense; and can it be said that either Blackstone or congress is wiser than they?   "Forgive us our *debts* as we forgive our debtors." (Matt., ch. 6, v. 12.)

An official bond is a full and complete acknowledgment of an existing indebtedness on the part of the obligors, which may be avoided upon certain conditions; in other words, such an indebtedness as may be liquidated and satisfied by faithful conduct, or by the payment of the obligated sum.   No one will claim for a moment that if Ross had not signed the bond, a valid judgment could have been entered against him in an action brought upon such bond.   Hence we are compelled to arrive at the inevitable conclusion that the signing and execution of the bond are what constituted the creation of his liability — the contracting of the debt or obligation.

If we should be in error in our conclusions thus far, then it would require us to look further into the questions asked, to wit: "When, if ever, was the debt contracted?"   If the signing of the bond was not the contracting of the debt, certainly the breach of it constituted, fixed and completed the liability or debt.   The bringing of suit, or the rendering of judgment, has nothing to do with creating the liability or contracting the debt.   Suit is the remedy to recover the debt or liability, and judgment the result of the suit.   Neither has anything to do as to the existence of the fact of a violation or breach of the bond, which was a thing in existence before suit and judgment.   The suit and judgment had nothing to do with the existence of that fact; it may have had something to do with establishment of the same; but nevertheless such fact must, in the nature of things, have had an existence before an action would lie.   Assuming that we are correct in our proposition, then the debt existed, the contract became complete, on October 12, 1874 — some thirty days before the issuance of the patent.   But opposite counsel say the patent relates back to the date of making final proof of the homestead entry.

Now if the most limited and restricted meaning is to be

Leonard v. Ross.

applied to terms used by congress, as they insist in regard to the word "debt," then the same rule must also be applied to the word "issuing," or issue; and we believe this court has already held, in *Comm'rs of Sedgwick Co. v. Bunker*, 16 Kas. 498, that to issue bonds, they must not only be executed, but must be delivered. It requires delivery to constitute issue, issuing, or issuance. This court has also held in several cases that there is no conveyance without the delivery of the deed. (8 Kas. 409, 429; 14 id. 175; 15 id. 252; 16 id. 166; 17 id. 565; 18 id. 538.)

' The government has a right to withhold the patent at any time before delivery for various legal and just reasons—for frauds, discovery of mineral, etc.; hence it seems to us that the title could not and did not pass to Ross until the delivery of the patent, which could not have been done before its date (December 15, 1874), and therefore there was no "issuing" of the patent in contemplation of law prior to the contracting of the debt.

The opinion of the court was delivered by

VALENTINE, J.: The main question involved in this case is, whether a certain piece of land, owned by A. D. Ross, was exempt from a certain execution held by S. D. Leonard, sheriff of Harvey county, Kansas. Ross, who was plaintiff below, claims that it is so exempt under section 4 of the act of congress which enables actual settlers to secure homesteads on the public domain. (12 U. S. Stat. at Large, p. 393; U. S. Rev. Stat., p. 423, § 2296.) Said section reads as follows:

"No lands acquired under the provisions of this act shall in any event become liable to the satisfaction of any debt or debts contracted prior to the issuing of the patent therefor."

The facts necessary for a correct understanding of said question as presented in this case are as follows:

1. On May 3, 1873, Ross entered said land under said homestead act of congress.

2. On October 25, 1873, Ross became surety on the official bond of G. D. Monger as treasurer of said Harvey county.

3. On May 19, 1874, he made his final proof, and paid his money for his land under the 8th section of said homestead act, thus commuting residence by the payment of money.

4. At some time or times "between November 5, 1872, and October 12, 1874," Monger and his sureties became liable on said official bond for breaches thereof designated as "defaults, deficits and conversions of money."

5. On December 15, 1874, Ross's patent for his land was issued to him.

6. On April 24, 1875, an action was brought by the commissioners of Harvey county against Monger and his sureties for said breaches of said official bond.

7. On December 27, 1876, a judgment was rendered against Monger and his sureties (including Ross) for said breaches of said bond, in the sum of $1,054.83.

8. Whereupon an execution was issued and levied upon said land by said sheriff to satisfy said judgment.

The principal questions involved in the main question are as follows :

1. Was the claim of Harvey county against Monger and his sureties at any time a "debt" within the meaning of said homestead act, and if so, when did it become such debt?

2. When did said land become subject to executions for debts?

The defendant in error Ross claims that the claim of the county commissioners of Harvey county against Monger and his sureties was a debt, and that it accrued when he (Ross) signed said official bond. Now, for the purposes of this case, we shall assume that said claim of the county commissioners of Harvey county was a debt, (though with our view of the other questions involved in the case, it makes no difference whether it was a debt, or some legal claim for damages.) But we cannot give our assent to the doctrine, that such debt accrued when said bond was executed. The claim evidently did not have any existence at that time, and probably did not have any existence for several months afterward. A penal bond (such as a county treasurer's official bond is) does not

of itself create a debt. It is not the "acknowledgment of an existing indebtedness," (as was a recognizance in its original form,) as is claimed by the defendant in error; but it is simply a penal bond, to be void if no breach of the condition occurs, and, in effect, to cover only actual damages where some breach of the condition does occur. In our opinion, then, no debt accrued against Monger or his sureties, until some breach of the official bond occurred. And an argument might even be made that no debt accrued against the surety Ross, until judgment was rendered against him, for the breach of the bond; but we have assumed otherwise, and probably correctly, that for the purposes of this case, and of this class of cases, the debt accrued when the breach of the bond occurred. Then when did the breach of the bond occur? The record does not show, except that it shows that it occurred between two certain dates. Now as Ross was the plaintiff below, and upon him devolved the burden of proof; and as it will be presumed, in the absence of anything to the contrary, that Leonard, the officer, did his duty, and as all property is *prima facie* subject to execution, it must be presumed that said breach occurred at the latest date fixed by the plaintiff, Ross. The parties agree that the breach occurred between Nov. 5, 1872, and Oct. 12, and 1874; and this is as definite as they fix the time; hence, we must assume that the breach occurred just before Oct. 12, 1874. But in our opinion, if it occurred at any time between May 19, 1874, (the time when Ross made his final proof and payment,) and October 12, 1874, the land was subject to said execution. Ross was entitled to his patent on May 19, 1874, and therefore his rights must be determined as though the patent had in fact been issued on that day. (*Stark v. Starrs*, 6 Wall. 402, 418; *Levi v. Thompson*, 4 How. 17; 3 How. 441; 4 Wall. 210; *Myers v. Croft*, 13 Wall. 291; *Ogden v. Walters*, 12 Kas. 284, 296; *Stone v. Young*, 5 Kas. 229, 231, 232; *McMahon v. Welsh*, 11 Kas. 292; *Gulf Rld. Co. v. Morris*, 13 Kas. 302, 318; *Commissioners of Saline Co. v. Young*, 18 Kas. 443; *Bellinger v. White*, 5 Neb. 399.)

The failure of the officers to issue the patent at the time that it ought to be issued, does not affect the rights of any person. The property becomes the purchaser's at the time he pays for it, with the bare, naked legal title only remaining in the government. After Ross paid his money, he did not any longer hold his land under the provisions of the congressional homestead act. When he paid for his land, he thereby took it out of the further operation of said homestead act; and after paying for it, he in fact abandoned it as a residence, which he could not properly have done, if he had still been holding it under the provisions of said homestead act. That provision of said homestead act which refers "to the issuing of the patent" has reference to that period of time when the patent ought to be issued, and not to the mere clerical work of issuing it.

The judgment of the court below will be reversed, and cause remanded for further proceedings.

All the Justices concurring.