WILLIAM HALE, *et al.*, v. CHARLES S. WILDER.

1. SHAWNEE LANDS; *Treaty of May* 10, 1854. Lands that were allotted in severalty to members of the Shawnee tribe of Indians, under the second article of the Treaty of May 10, 1854, and afterwards abandoned for other lands, do not become a part of the "surplus lands" which was set apart for the absentee Indians by the President of the United States.

2. ————— *Chiefs, no right to sell lands.* The chiefs of the Shawnee tribe have no authority, even with the consent and approval of the Secretary of the Interior, to dispose of said lands and make deeds therefor; and a deed so made confers no title.

*Error from Johnson District Court.*

WILDER brought ejectment for the S½ of the SW¼ of Sec. and the W½ of Sec. 8, Town 13, Range 22, being 400 acres

of land in Johnson county, and being a part of the 200,000 acres ceded by the government to the Shawnee tribe or nation of Indians by Treaty of May 10th, 1854: (10 U. S. Stat. at Large, 1053.) The opinion contains a sufficient statement of the provisions of said Treaty, and of the status of the particular tracts of land in controversy. Under said treaty certain members of the Shawnee tribe were to have a head-right or allotment of 200 acres each, and Lewis Hayes and George Sylcambus, two members of said tribe, each made *two* selections instead of one. The lands in question were covered by one of these selections or allotments. When the double allotments were discovered, those covering the lands in question were, by order of the Interior Department, cancelled; but before the discovery and cancellation the "surplus lands," so-called, had been set apart by direction of the President. The defendants, *William Hale, David Weisinger, J. T. Woodward,* and *John Wickens,* were settlers or squatters on the lands in controversy when this suit was brought, and were so in possession on and before April 7, 1869. On said 7th of April congress passed a Joint Resolution entitled "A Resolution for the Relief of Settlers upon the Absentee Shawnee Lands in Kansas," (16 Stat. at Large, 53,) which resolution is as follows:

"WHEREAS a large tract of land set apart by a treaty with the Shawnee tribe of Indians, dated May 10, 1854, and proclaimed November 2, 1854, for the benefit of certain absentees of said Shawnee tribe is now, and for many years past has been, occupied by a large number of white settlers and citizens of the State of Kansas; and whereas the beneficial interest of the said absentee Shawnees in said lands was and is absolutely forfeited by reason of their continued absence and non-affiliation with the said Shawnee tribe; and whereas the said lands were ordered to be publicly sold at the United States land office at Topeka, August 3, 1863, by Abraham Lincoln, president, by his proclamation dated March 20, 1863, and by reason of the absence of large numbers of said settlers from their homes in the Federal armies the sale was indefinitely postponed: Therefore,

"*Resolved, by the Senate and House of Representatives of the United States of America in congress assembled,* That each *bona fide* settler now occupying said lands, and having made improvements thereon, or the heirs at law of such, who

is a citizen of the United States, or who has declared his intention to become such, shall be entitled to purchase the land so occupied and improved by him, not to exceed 160 acres in each case, at the price of $2.50 per acre, under such rules and regulations as the Secretary of the Interior shall prescribe: Provided, however, That the proceeds of such sales shall be applied in accordance with the provisions of the treaty between the United States and the said Shawnee Indians, proclaimed November 2, 1854."

This resolution was approved April 7, 1869; and defendants, claiming to be at that time, and ever since, *bona fide* settlers, occupying said lands, and having made improvements thereon, "insist that they have an equitable title thereto, paramount to any title of the plaintiff, and that they cannot be ejected therefrom." On the 23d of July, 1869, the Secretary of the Interior prescribed certain rules and regulations, as authorized by said Joint Resolution, as follows:

"MODIFIED RULES AND REGULATIONS regarding the execution of conveyances of lands held in severalty by members of the Shawnee tribe of Indians of the State of Kansas, under Treaty concluded May 10th, 1854: * * *

"*Fifth:* In cases of allotments for which no owner nor heir thereof survives, or allotments to which the allotee was not entitled, the chiefs may convey the same by deed; but the purchase money must be paid into the hands of the agent, and held by him subject to the direction of the Secretary of the Interior, to be applied for the benefit of the tribe; and such conveyance must be certified by the agent, and submitted through the office of Indian Affairs to the Secretary of the Interior for approval."

*Wilder* claims title in fee by deed from the chiefs of the Shawnee Nation to himself, dated December 15, 1869, and in consideration of $2,000 paid by him therefor in accordance with said fifth modified rule. The action was tried at the April Term, 1871, and the court found in favor of *Wilder*, and he had judgment for the recovery of the possession of the lands. The defendants bring the case here on error for review.

*Holmes & Dean*, for plaintiffs in error:

1. The allotment of the land in controversy to the allotees,

Hays and Sylcambus, was an error, or fraud, and was afterwards discovered to be so, and cancelled; and by consequence, not being held in severalty, or selected for any of the purposes as provided in article 2 of Treaty of 1854, it formed a part and parcel of the "residue," or "surplus," and must be treated as a part of the "Absentee Shawnee Lands," as designated in said treaty; and plaintiffs in error, being on the land on the day on which congress passed the Joint Resolution, approved April 7th, 1869, have secured to them thereby a vested right to the land, and an exclusive right to buy it under and by virtue of said resolution.

The report of the Commissioner of Indian Affairs, made to the Secretary of the Interior, October 8, 1857, gives in detail the execution of those parts of the Treaty of 1854, designating the purposes for which the 200,000 acres were ceded to the Shawnees, and the respective quantities of land set apart in accordance with provisions of said treaty. These selections or allotments are—

| | |
|---|---:|
| To 697 members of the Shawnee tribe, who elected to receive land in severalty, 200 acres each, | 138,146.58 |
| To 167 of the Black Bob band, who elected to hold in common, 200 acres to each person, | 33,392.87 |
| To Eli Blackhoof, under article 7 of the treaty, | 640 |
| To Joseph Parks, under article 7 of the treaty, | 1,302.48 |
| To churches, societies, schools, etc., under article 2, | 2,394.15 |
| Whole number of acres selected or alloted, | 175,876.08 |
| Leaving a "surplus," set apart by the President as "Absentee Shawnee Lands," | 24,138.31 |
| Making a total (instead of 200,000 acres) of | 200,014.39 |

The excess of 14.39 acres arose from conforming the selections to legal subdivisions. The certificate of the Secretary of the Interior given in evidence shows that Lewis Hayes, Louisa McCane, George Sylcambus, and Nancy Whetstone made double selections of 200 acres each, and that " said allotments were afterwards set aside as being *double* allotments." Now it is clear that this 800 acres " double allotments," for which there was no one to take, would have been a part of the " surplus," and added to the " Absentee Lands," increasing the amount to 24,938.31

acres—and of course subject to be purchased by plaintiffs in error, under the provisions of the Joint Resolution of April 7th, 1869. Congress by such resolution assumes that legislation is necessary for the sale of the surplus unassigned land. The Treaty of 1854 had provided no mode for its disposal; it merely directed that it should be sold after a certain time. When the joint resolution was passed, the plaintiffs in error were on the land. The joint resolution was a *special grant*, giving *vested rights* to all who were in a condition and position to avail themselves of it. The "modified rules" under which the land in controversy was sold to Wilder were adopted July 23d, 1869, four months after the passage of said joint resolution.

2. The fifth modified rule under which the lands were sold to Wilder is an absurdity on its face. "Or allotments to which the allotee was not entitled." That is plain language. Lands no one took, and no one to take; a title that never passed from the government, or if it did, was revoked, nor vested in any one in severalty, the chiefs may sell! Where, either by treaty or law, is there any power given to the chiefs to sell or convey any part of the Shawnee surplus? The treaty of 1854 provides that the surplus is to be sold. The treaty does not say in words that the sale is to be made by the United States. It does provide, however, that the proceeds shall go into the Treasury of the United States for the purposes as stated in the treaty. The conclusion is almost irresistible that the sale is one which the United States is alone competent to make; and nothing is shown in the treaty or in any legislation in this connection, which can authorize the Secretary of the Interior to employ the Shawnee chiefs to execute conveyances of allotments to which the allotee was not entitled.

3. It was error to exclude the copy of the letter of Comm'r Wilson to Mr. Niblack. That letter is a paper of record in the Land Office, and is made evidence by law of congress: 1 Lester's Land Laws, p. 47, § 7; p. 88, No. 75.

It was error also to deny to plaintiffs in error the right to prove that agent Roberts promised and agreed with them that

they should have the preference to take a deed from the chiefs at the same price, they being on the land.

*Wilson Shannon*, for defendant in error:

1. The Shawnee treaty of May 10, 1854, provides that after all the Shawnees and other persons herein provided for shall have received their shares of the two hundred thousand acres of land, it is anticipated that there will still be a residue; and as there are some Shawnees who have been for years separated from the tribe, it is agreed that whatever *surplus remains* after provision is made for all present members of the tribe, shall be set apart *in one body of land* in *compact form*, under the direction of the president of the United States. The provisions of the treaty were duly executed. Separate lists were made out, with appropriate headings—first, the land given to the churches, societies, and the persons named; second, the land allotted to each Indian electing to hold his land in severalty; third, a list of the land set apart in a compact body to the members of the Black Bob band, to be holden in common; and fourth, a list of the land set apart by the president as the *surplus*. This list was approved of by the president, and it is admitted that the land in question is no part of this *surplus*—that is, it is not included in the list of lands set apart by the president as the *surplus*—nor is it contiguous. It is some eight miles distant, and therefore cannot be claimed as a part of the surplus.

The surplus is a well-known tract of land lying in a compact body, and each parcel of it is described according to the government survey. And congress, when reciting in their joint resolution of April 7th, 1869, that a large tract of land had been set apart by the treaty of 10th May, 1854, for the benefit of certain absentees of said Shawnee tribe, must have alluded to and meant the list of absentee lands filed in the office of Indian Affairs, and approved of by the president. The land in question not being on that list, but some eight miles distant from it, it follows that the said joint resolution can have nothing to do with the land in question. But I do not believe

that congress had any power to pass the joint resolution of 1869, or that it has any force as against the rights of the Shawnees who never assented to it. What right had congress to say that the settlers should have this surplus land for $2.50 per acre? It is admitted that it was the land of the *Shawnees;* and can it be claimed that congress, without the consent of the Shawnees, can sell their lands, and for such price as congress may name?

The plaintiffs in error did not go on the land, believing it to be surplus land, because at that time it was known to be allotted land, and so appeared on the books and plats in the office of the agent for the Shawnees. But now they come into court and claim the land under the joint resolution of 1869 for the price of $2.50, when it is admitted that Wilder bought the land according to the rules of the Interior Department and paid therefor at the rate of $5 per acre. In other words, plaintiffs in error ask the court to aid them in defrauding the Shawnee Indians out of $1,000.

2. It is claimed by counsel for plaintiffs in error that the Secretary of the Interior had no right to sell this land. The answer is, he did not sell it; it was sold by the chiefs of the Shawnee nation, by and with the consent of the Secretary of the Interior. The fifth modified rule prescribed by the Secretary of the Interior points out the manner in which the chiefs of the tribe may sell and convey, but the sale and conveyance so made has no validity until approved by the Secretary. The Shawnee nation, being the owners of the land in question by a cession from the United States, would have the full power to sell the land to any person or for any price they saw proper. In other words, they would have the full power to dispose of their lands as any one else could dispose of his land, unless restricted by treaty or restrained by the principle adopted by our government that the Indians could not sell their land to any one except the United States or to some other person with the consent of the government of the United States. There is nothing in any treaty restricting the Shawnee nation from selling the land in question. The only

limitation on their right to sell to whom they pleased is the consent of the government to such sale. This consent in the case before the court was given through the Secretary of the Interior acting under the full powers conferred on him by the treaty and the act of congress of July 9th, 1832: 1 Brightley's Dig., 421.

3. Roberts, the agent of the Shawnees, had no right or power to promise and agree with the plaintiffs in error that they should have the preference to take a deed from the chiefs to the land in controversy in preference to any other party at the same price, they being on the land; and it was no error to reject testimony of such promise.

The exemplified copy of a letter of the Commissioner of the General Land Office, addressed to W. E. Niblack, offered in evidence by the plaintiffs in error, was a private letter from the commissioner to a private individual; and there is no law either of congress or of this state which authorizes a letter addressed to a private individual by an officer of the government, no matter how elevated the officer may be, to be used in evidence in any case.

The opinion of the court was delivered by

Kingman, C. J.: Four errors are assigned to which attention will be given in their order. The court excluded a copy of a letter written by commissioner Wilson to Hon. W. E. Niblack as to the status of the land in controversy. This was right. The letter was to a private individual. Its contents did not tend to prove any facts; they only showed the *opinion* of an officer of the government as to the title to certain lands. The act of congress referred to only makes an exemplified copy of a paper evidence where the paper itself would be evidence; and the commissioner's letter would not be evidence in this case.

II. The witness Abbott was asked the question, "Did Graham Rogers, one of the acting chiefs of the Shawnees, in Washington City, before the adoption of the fifth modified rule, execute a deed to you of the land in controversy?" The

court refused to permit the question to be answered. There is no explanation of the use that could be made of the answer, nor can we perceive any relevancy. It did not show or tend to show that the title was transferred from the Shawnee tribe to Abbott. If there was such a deed made, and it conveyed no title, as both parties contend, then even the introduction of the deed itself, if one existed, became immaterial.

III. The court refused to permit Mr. Roberts, the agent, to testify whether he knew that the defendants were in possession and occupancy of the land at the time of the sale, and whether he promised them the land should not be sold till he had given them notice and a preference. Answered either way the testimony would have had no bearing upon the case under the issues on trial. Again, the questions were not proper cross-examination of the witness: and if considered as in chief, were not in proper form. The record is silent as to the grounds of objection, or the reason of the court. In any view the questions were immaterial and irrelevant.

IV. The only other error alleged is that the judgment was for the plaintiff when it should have been for the defendants. The cause was tried by the court without the intervention of a jury, and a judgment rendered for the plaintiff, to which defendants excepted. The questions presented to this court are purely questions of law, the counsel upon either side in their arguments conceding the facts as they appear of record. The action was for the recovery of four hundred acres of land in Johnson county. The plaintiff below (defendant in error in this court) claiming by a deed from Graham Rodgers and Charles Tucker, chiefs of the Shawnee Nation, to him. The consideration of the deed is $2,000. It is attested by James B. Abbott and R. S. Roberts, and acknowledged before Roberts the U. S. Indian agent for the Shawnees. On the 5th of January, 1870, the acting Commissioner of Indian Affairs submitted this deed to the Secretary of Interior for his approval, and on the 6th of January, 1870, the deed was approved by the Secretary of the Interior. It is claimed that this deed when so made and acknowledged vested the legal title to the land in

35—8TH KAS.

the defendant in error. The plaintiffs in error admit the regularity of the steps taken to procure the deed, and that it is done in conformity with the fifth modified rule of the Department of the Interior, but deny the power of the Department to dispose of the lands, on two grounds: First, that the lands are part of the " surplus lands " of the Shawnee tribe, and are by the joint resolution of congress of 1869 to be sold to the settler occupying said lands, and having made improvements thereon, at the price of $2.50 per acre; (16 Stat. at Large, p. 53:) Second, That the Department had no power under the laws and treaties to dispose of the lands, unless it was under the joint resolution referred to. Whether the decision of the first question be one way or the other, the proceeds of the sale go alike to the use of the Shawnee Indians as a nation, so that so far as they are concerned it makes no difference how it is decided, except as to the amount. If the plaintiffs in error are right in their construction of the laws and treaties, the Indians will get $2.50 per acre for the land when it is sold under the joint resolution of 1869. If the title of the defendant in error is good, then the Indians have already to their credit on the sale made to him, and paid to the proper department for their use, $5.00 per acre. The land is probably worth much more than either sum, so that to the parties the decision is one of much greater importance.

It is admitted by both parties that the land in controversy is a part of the two hundred thousand acres ceded to the Shawnee Indians by the second article of the treaty of 1854, between the government of the United States and the Shawnee tribe of Indians. (10 U. S. Stat. at Large, 1053.) We are first to determine what is the *status* of this land, and this demands careful consideration of the whole treaty; but we think the grounds of our decision may be briefly stated so as to be understood. It appears from the record, and is conceded in argument, that the land in controversy was double allotment land made to Lewis Hayes and George Sylcambus, and that they have since received other lands. The plaintiffs in error contend that these lands have now become a part of the surplus land set apart for the

absentee Shawnee Indians, and are covered by the joint resolu-
of congress of 1869. The defendant in error insists that they
remained allotted lands, and were subject to the disposal of the
department of the government having charge of Indian affairs.
The condition of the lands is anomolous, and one not contem-
plated by the treaty. That instrument makes no positive
provision for a case of double allotments, such a contingency
not having suggested itself to the parties. The treaty provides
that there is to be a certain specified quantity of land out of
the two hundred thousand acres given, first, to the churches,
societies, and schools, and a few individuals named in the treaty,
on certain terms; second, two hundred acres are to be allotted to
each Shawnee Indian who shall elect to hold his land in sever-
alty; third, those Indians of the Black Bob and Long-Tail
bands who shall prefer to hold their lands in common are to
have land amounting to two hundred acres each set apart in
one body to be held in common; and after all these selections
are made it is supposed there will be a surplus, which shall be
set apart in one body of land, in a compact form, under the
direction of the president of the United States, for the use of
such absentee Indians of the tribe as shall return within a
given time; and what of this tract is not so taken by the absent-
ees within the stipulated time is to be sold for the benefit of
the whole tribe. In these different ways the whole of the two
hundred thousand acres ceded to the Shawnees by the treaty
were to be appropriated. All these various selections were
made in due time, and by the proper authorities, and the same
became fixed by the selections made. It then became known
that there was a small portion that had been double allotted,
including the land in controversy. The different societies and
individuals had all the land they were entitled to. The In-
dians who chose had their head-rights. Those who preferred had
their proportion assigned them in common. The residue had
been set apart for the absentees in one body in a compact form
under the direction of the president of the United States.
These different selections and lists of land were required to be
made out within certain periods designated in the treaty, and

were so made out, and thus the status of the land became established. Its character was fixed. The absentee lands were set apart by the president as surplus land, in a compact form as the treaty required. The land in controversy is seven or eight miles from that body. It is probably true that if no mistake had been made the body of the absentee lands would have been increased by eight hundred acres; but it is obvious that the identical land in question never could, under the provisions of the treaty have been a part of the "surplus," because the surplus was to be in one body in a compact form. It is not denied that the mistake is one that could be corrected by the courts if any one of the parties to the treaty had been the sufferers thereby. Each of the classes of beneficiaries have received all that class was entitled to if no mistake had been made. The surplus was more than sufficient to meet the requirements of the absentees, leaving a large residue to be disposed of for the benefit of the Shawnee nation. The tract in dispute also belongs to the nation, but not as "surplus" lands under the treaty. No provision is made for double allotments. They are outside the treaty. The status of the land became fixed by the selections as made and recorded, and the nearest that we can come to the spirit of the treaty is to hold them as allotted lands not taken by the allottees, and thus become the property of the nation to be disposed of under the direction of the government. This must be the view taken by the department of the Interior in making provision for the sale of the land under the fifth modified rule in accordance with which the defendant in error purchased the land.

The question remains, had the chiefs of the Shawnee nation acting for the nation, the right to dispose of these lands, with the consent of the Secretary of the Interior? At an early day the principle was adopted that the Indians could not dispose of their lands without the consent of the government. This consent may be given by treaty or by act of congress, and we know of no other way. Undoubtedly the consent may be given by the executive, in the execution of the terms of a treaty, or in carrying out the provisions of a statute, when this power is

given in the treaty or statute, for then it is in fact the consent of the treaty-making or legislative branch of the government, expressed through the executive. The learned counsel for the defendant in error, as we understand him, goes one step further, and claims that this consent may be given "as in this case by the executive branch of the government acting under and by virtue of the general powers conferred on the executive." If by this is meant that the Indians may dispose of their land by consent of the executive where the executive by the provisions of any treaty or law is authorized to give such consent, then it is undoubtedly true; but if it is to be understood as asserting the doctrine that the consent of the executive without the previous authorization thereto of the law-making department is all that is necessary, then it asserts a doctrine contrary to the fundamental principles and the uniform practice of the government, and cannot be sanctioned. No precedent or authority for such a position is referred to, nor has any fallen under our observation.

We have not been able to find where the executive has been authorized by law to give his consent to the disposal by the Shawnee chiefs of the land belonging to the nation. We are referred to several provisions of laws and treaties which we will notice briefly. The act of congress of July 9th, 1832, 1 Brightley's Digest, 421, is referred to; but surely it needs no argument to show that the power to direct and manage Indian affairs, and all matters arising out of Indian relations, does not authorize the sale or consent to the sale of the Indian lands. In all the years that it has been in force, no such construction has been given it. The ninth article of the treaty of May 10th, 1854, provides for issuing patents to such Shawnees as may have made separate selections, but nowhere makes any provision for the lands of the Shawnees except for such as are absolutely taken by individual members of the tribe, and held in severalty, and none others. The act of congress of March 3, 1859, (11 U. S. Stat. at Large, 431,) authorizes the Secretary of the Interior to cause patents to issue to such Indians as have made selections, such patents to be under such

guards and restrictions as may be prescribed by said secretary. These are all the acts of congress or treaties that have any bearing on the questions that have been pointed out or met the observation of the court, and none of them are such as in our view give any validity to the sale made by the chiefs to the defendant in error. If the foregoing propositions are correct, then neither of the parties to this action has any right to the land; it still remaining the property of the Shawnee tribe of Indians, to be held or disposed of as the government and the Shawnees may agree. It is not a part of the surplus, and therefore not covered by the joint resolution of congress referred to, and therefore the plaintiffs in error have no rights in the land. The title of the defendant in error is not such as the law sanctions, and therefore he could not recover. It follows that the judgment of the court below is erroneous, and must be reversed.

All the Justices concurring.