# SUPREME COURT,
## STATE OF KANSAS.

## JANUARY TERM, 1891.

### PRESENT:

Hon. ALBERT H. HORTON, Chief Justice.
Hon. DANIEL M. VALENTINE, } Associate Justices.
Hon. WILLIAM A. JOHNSTON, }

John J. O'Brien *et al.* v. Thomas Bugbee *et al.*

1. Ejectment — *Title of Claimant.* In an action in the nature of ejectment, the plaintiff must recover upon the strength of his own title, and not upon the weakness of the title of the defendant who has the actual possession of the real estate.

2. Indian Title — *Descent of Real Estate.* In 1860, under the tribal organization of the Shawnee Indians, the descent of real estate was cast in accordance with the custom and decision of that tribe.

3. Evidence — *Custom of Tribe.* Where a plaintiff relies upon title to real estate alleged to be cast by descent upon his grantor in accordance with the custom and decision of an Indian tribe, he must establish the custom or decision of the tribe as to descent or distribution at the time of the death of the former owner or possessor from whom he claims his grantor inherited the property.

4. ———— *Possession of Indian Land — Ejectment, Not Maintained.* Where a plaintiff brings his action in the nature of ejectment against a defendant in the actual possession of Indian land, properly patented to a member of the Shawnee tribe (now deceased), under the provisions of a treaty between the United States and the Shawnee Indians, concluded on the 10th day of May, 1854, and the act of Congress of March 3, 1859, and such defendant claims color of title and possession under a deed from the chiefs of the tribe, approved by the secretary of the interior, the prior possession of such Indian

1—46 KAS.

land by the plaintiff is not sufficient for him to recover upon as against such a defendant, if such plaintiff fails to show any title or other right of possession on his part.

*Error from Johnson District Court.*

On the 7th of July, 1887, *John J. O'Brien* commenced his action against *Thomas Bugbee*, Henry W. Cresswell, John C. McCoy, sr., Charles Elliott, Frank M. Lyon, W. W. Harris, John C. McCoy, jr., Jo. Smith, and David Updegraff, in ejectment, and also for partition of the following-described real estate, situated in Johnson county: The west half of the northwest quarter and the northeast quarter of the northwest quarter of section 1, and the east half of the northeast quarter of section 2, all in township 12, of range 23, ($207\frac{44}{100}$ acres.) The defendants Thomas Bugbee, Henry W. Cresswell and John C. McCoy, sr., filed their separate general denials.    David Updegraff, in his separate answer, claimed to be the owner of an undivided one-half of said land. Trial had before the district court without a jury, at its May term, 1888.    The court made the following special findings of fact:

"1. On the 28th day of December, 1859, the lands in controversy, to wit, the west half of the northwest quarter and the northeast quarter of the northwest quarter of section 1, and the east half of the northeast quarter of section 2, all in township 12, of range 23 east, in Johnson county, Kansas, (200 acres,) were duly patented by the United States of America, through the then president, unto Polly Manture, a member of the tribe of Shawnee Indians.    The said patent upon its face restricts a sale by the said patentee of said lands, without the approval of the secretary of the interior of the United States, under such rules and regulations as he may from time to time prescribe.

"2. Said Polly Manture and George Buchannan, a white man, were duly joined in marriage in the spring of the year 1855, in Johnson county, Kansas, and thereafter had born to them a daughter named Sally Buchannan, and said George and Polly Buchannan cohabited as husband and wife until her death, and they never had any other child or children.

"3. Said lands were taken actual possession of by said Polly and George Buchannan as early as the year 1857, and were improved and cultivated by him until his death.

"4. Polly Manture Buchannan died intestate on the farm, in the year 1860, seized in fee of the lands and tenements in controversy, and George and Sally Buchannan survived her, and said George Buchannan died thereon in the year 1879.

"5. Sally Buchannan married one Gotlieb Zeigler, a white man, in said county, on September 20, 1874, and cohabited with him on said farm as his wife, until the 9th day of December, 1874, when she died intestate, without child or children, her husband and her father, George Buchannan, surviving her, and then residing on the lands in controversy.

"6. In the year 1861, said George Buchannan intermarried with a widow named Ophelia Maria Gibbs (sometimes called and known as Maria Gibbs), who had a son named Marow Gibbs, by a former husband. By this wife the said George Buchannan had no child or children, and they all remained on said lands and cultivated the same until the death of George Buchannan. George Buchannan and she cohabited as husband and wife from that period until his death, leaving her surviving him.

"7. On the — day of August, 1879, said George Buchannan died, leaving a last will and testament, wherein and whereby he devised all the lands and tenements in controversy unto the said Marow Gibbs, in fee-simple, which last will and testament was afterward duly probated in the probate court of Johnson county, state of Kansas, and his widow, the said Ophelia Maria Buchannan (formerly Gibbs), in writing and in due form of law, relinquished in the said probate court all her rights under the said will, and under the law in such case made and provided, and consented in writing to the said devise of all said lands and tenements unto her son, Marow Gibbs, who remained in possession with his mother, the widow Buchannan, and he cultivated the said lands and tenements until the year 1883, when said McCoy took possession of all said lands and tenements.

"8. Said Marow Gibbs and wife, on the 9th day of February, 1883, for value received, duly conveyed all said lands and tenements unto John J. O'Brien, the plaintiff in the action; which deed was duly recorded in the proper office on the 26th day of February, 1883.

"9. On the 10th day of June, 1875, the said Gotlieb Zeigler (claiming to be the heir of Sally Zeigler, deceased, formerly Buchannan) duly conveyed all said lands and tenements unto James H. McCartney, for value received; which conveyance

was duly recorded in the proper office on the 10th day of January, 1878.

"10. On the 5th day of August, 1875, the said Gotleib Zeigler duly conveyed all said lands and tenements, for value received, unto David Updegraff, one of the defendants in this action; which conveyance was duly recorded in the proper office on the 5th day of August, 1875.

"11. On the 21st day of March, 1876, the said James H. McCartney, for value received, duly conveyed all his interest and estate in and to said lands and tenements unto the said David Updegraff; which said conveyance was duly recorded in the proper office on the 14th day of June, 1876.

"12. The said George Buchannan from 1855 to 1862 was seen at the pay-house every year; and the United States government paid the annuities in those years to the tribe in gold and silver coin, and Buchannan always paid in gold and silver to the Shawnee Indian post-trader his yearly store account immediately after said payment of annuities.

"13. Prior to the year 1868, the tribe of Shawnee Indians had no written law of their own regulating or governing the descent, distribution and inheritage of lands and tenements from deceased Shawnee Indians who died possessed of their head-rights, allotments under the treaty of May 10, 1854.

"14. From 1864 up to the year 1868, the tribe of Shawnee Indians operated under the laws of Kansas relative to and governing the descent, distribution and inheriting of the lands of individual Shawnees, deceased, by the council and chiefs adopting for the tribe the said laws of Kansas.

"15. On April 2, 1866, George Buchannan and his wife (née Gibbs) conveyed, by deed duly acknowledged, for the sum of $640 (as appears in the deed to Joachim Rathjen), parcel of the lands in controversy, to wit: Southeast quarter of northeast quarter of section 2, and the southwest quarter of the northwest quarter of section 1, (80 acres,) all in township 12, of range 23, in Johnson county, Kansas, and which said conveyance was duly recorded on April 2, 1866; and which deed recites that it was made, executed and delivered by said George Buchannan as sole heir at law of Polly Manture, deceased, and which deed is not approved by the secretary of the interior.

"16. Afterward the said Joachim Rathjen duly conveyed all his estate in and to said eighty acres, for value received, unto John C. McCoy, one of the defendants in this action,

and which said deed was duly and forthwith recorded in the proper office.

"17. I find, as a further fact in the case, that the following instrument was delivered to John C. McCoy on the 3d day of February, 1882, pertaining to the lands in controversy, to wit:

"'UNION INDIAN AGENCY,

MUSCOGEE, INDIAN TERRITORY, February 3, 1882.

"'We, Charles Bluejacket and Charles Tucker (chiefs of the Shawnee tribe of Indians, late of Kansas, now of the Indian Territory), parties of the first part, for and in consideration of the sum of $1,500 in hand paid by John C. McCoy, party of the second part, the receipt whereof is hereby acknowledged, do grant, bargain, sell and convey unto the said John C. McCoy, and to his heirs and assigns forever, the following-described tract, piece or parcel of land, situate in Johnson county, state of Kansas, to wit: The west half of the northwest quarter and the northeast quarter of the northwest quarter of section 1, and the east half of the northeast quarter of section 2, all in township No. 12, range No. 23 east, and being the same land patented to Polly Manture, a deceased member of Shawnee tribe—to have and to hold the said above-described pieces or parcels of land, together with the appurtenances thereunto belonging, unto the said John C. McCoy, his heirs and assigns forever, in terms of general warranty.

"'In testimony whereof, we have hereunto set our hands and seals the day and year above written.             CHARLES BLUEJACKET,   (SEAL.)

"'Attest: J. GORE.                 CHARLES TUCKER.       (SEAL.)

EMILY D. TUFTS.'

"'UNION AGENCY, INDIAN TERRITORY, ss.: I, John D. Tufts, United States Indian agent for the Union Agency, Indian Territory, hereby certify that Charles Bluejacket and Charles Tucker, the grantors named in the within instrument of writing, personally appeared before me and signed the same in my presence, and acknowledged the execution thereof as their free act and deed for the purposes therein expressed.

"'In witness whereof, I have hereunto set my hand this third day of February, 1882.             JOHN D. TUFTS, *United States Indian Agent.*'

"Which was afterward submitted to the secretary of the interior for approval, and by him approved, as appears from the following indorsement thereon:

"'DEPARTMENT OF THE INTERIOR,

OFFICE OF INDIAN AFFAIRS, October 24, 1882.

"'The within deed from Charles Bluejacket and Charles Tucker, Shawnee chiefs, for lands of Polly Manture, to John C. McCoy, is respectfully submitted to the secretary of the interior for his approval.

H. PIERCE, *Commissioner.*'

"'DEPARTMENT OF THE INTERIOR, October 27, 1882.

"'The within deed is hereby approved.

M. H. JOSLYN, *Acting Sec'y.*'

"'Filed for record and recorded at 12 M., November 13, 1882, in book 43, page 595.             R. E. STEVENSON, *Register of Deeds.*

By J. A. STEPHENSON, *Deputy.*'

"18. On the 24th day of January, 1887, the said John C. McCoy and wife duly conveyed all said lands and tenements,

for the sum of $14,662.50, unto Thomas Bugbee and Henry W. Cresswell, which said conveyance was duly recorded in the proper office on the 26th day of January, 1887, and the said Bugbee and Cresswell have been in actual possession of all said lands and tenements, by their tenants, ever since March 1, 1887; the said McCoy then taking a mortgage thereon for a large portion of the purchase money; said McCoy being in actual possession of all said lands and tenements from March 1, 1883, until the said March 1, 1887.

"19. Said John C. McCoy occupied the said 200 acres in controversy, and enjoyed the rents, issues and profits thereof from the 1st day of March, 1883, until the 1st day of March, 1887, and the rental value of said land and tenements for and during said period was and is of the sum of $1,000.

"20. Said Bugbee and Cresswell occupied, used and enjoyed the rents, issues and profits of said 200 acres in controversy from the 1st day of March, 1887, until the present time, and the rental value thereof during said period was and is the sum of $500.

"21. In the year 1861, and while James B. Abbott was the United States local agent for the tribe of Shawnee Indians in Kansas, the said tribe of Indians, through its chiefs and councilmen, adopted orally the written laws of the state of Kansas, then in force, relating to the descent, distribution and inheritance of real and personal property, and thenceforth until said tribe left the state the said laws were their guidance; and prior to said period the said tribe of Indians had no law, written or unwritten, nor any custom or usage of their own, regulating the descent, distribution and inheritance of real property of which any member of the tribe died seized."

Upon the findings of fact, the court rendered judgment against the plaintiff, *John J. O'Brien*, and in favor of all the defendants, excepting David Updegraff. *O'Brien* and *Updegraff* excepted, and bring the case here.

*A. Smith Devenney*, for plaintiffs in error.

*Peak, Yeager & Ball*, for defendants in error Bugbee and Cresswell; *F. R. Ogg*, of counsel.

The opinion of the court was delivered by

HORTON, C. J.: This was an action in the nature of ejectment. John J. O'Brien claims to be the owner of and entitled

to the immediate possession of 200 acres of land in Johnson county. David Updegraff, one of the defendants, in his separate answer claims to be the owner of and entitled to the immediate possession of an undivided one-half of the land. Thomas Bugbee and Henry W. Cresswell claim both title and possession. Polly Manture, a Shawnee Indian woman, was the common source of title. The land was patented to her by the United States on the 28th day of December, 1859, as her allotment under the provisions of a treaty between the United States and the Shawnee Indians concluded on the 10th day of May, 1854, and the act of congress approved March 3, 1859. This patent contained the following restriction upon the alienation of the land by Polly Manture and her heirs, to wit:

"Have given and granted, and by these presents do give and grant unto the said Polly Manture and to her heirs, the tracts of land above described, but with the stipulation, prescribed by the secretary of the interior, under the act of congress aforesaid of March 3, 1859, that the said tract shall never be conveyed by the grantee or her heirs without the consent of the secretary of the interior for the time being."

In the spring of 1855, Polly Manture was joined in marriage to one George Buchannan, a white man, in Johnson county, in this state. Buchannan and wife took actual possession, in 1856, of and improved the lands, and cultivated them until their deaths, respectively. They had one child born unto them, named Sally Buchannan, who married Gotlieb Zeigler. Polly died on the farm in 1860, leaving surviving her a husband and the child, Sally. Buchannan remained on the farm, cultivated it all, except a few acres he used for pasture; what he did not use he leased to others. After the death of his wife, Polly, he married a widow by the name of Gibbs, with whom he continued to live upon the land until August, 1879, at which time he died, leaving a will, which was probated, by which he attempted to bequeath all of the land to Marow Gibbs, a son of his last wife by a

former husband. George Buchannan had no children by his last wife.

The plaintiff, John J. O'Brien, claims the land through a conveyance from Marow Gibbs and wife, dated February 9, 1883, and recorded February 26, 1883. Gibbs was a white man. Sally Buchannan, the only child of Polly and George Buchannan, was married to Gotlieb Zeigler, a white man, in 1874, and died within three or four months after her marriage, leaving no issue, and without having disposed of her interest in the land. Gotlieb Zeigler conveyed an undivided one-half of the land to James H. McCartney on the 10th day of June, 1875, and David Updegraff claims this undivided one-half through a conveyance from McCartney. On the 2d day of April, 1866, George Buchannan and his then wife conveyed eighty acres of the land in controversy to Joachim Rathjen, who afterward conveyed the same to the defendant John C. McCoy, sr. Neither the will of George Buchannan nor any of the conveyances above mentioned were approved by the secretary of the interior. On the 3d day of February, 1882, Charles Bluejacket and Charles Tucker, chiefs of the Shawnee tribe of Indians, in consideration of $1,500, by deed of general warranty conveyed all the lands to John C. McCoy, sr., which deed was on the same day duly acknowledged before John D. Tufts, United States Indian agent, and on the 27th day of October, 1882, was approved by the secretary of the interior, and recorded in the records of the county of Johnson on the 13th day of November, 1882. The defendant, John C. McCoy, sr., on the 3d day of March, 1883, took possession of the land under the two last-mentioned deeds, and continued in the uninterrupted possession thereof until he conveyed the same through his sons, on the 1st of March, 1887, in consideration of the sum of $14,662.50, to the defendants Thomas Bugbee and Henry W. Cresswell, and delivered possession thereof to them; and Bugbee and Cresswell have continued in the possession of the land until the present time. The trial court decided against O'Brien and Updegraff,

and in favor of Bugbee and Cresswell. The former excepted, and complain of the judgment of the court.

The 200 acres in controversy are known as "Shawnee Indian lands," and are included in the 200,000 acres or more ceded by the United States government to the tribe of Shawnee Indians by treaty of May 10, 1854, between the government and the Indians. (See 10 U. S. Stat. at Large, p. 1053.) One of the articles of the treaty provides for the issuing of patents to the several members of the tribes and "heads of families," as follows: "Congress may hereafter provide for the issuing to such Shawnees as may make separate selections, patents for the same, with such guards and restrictions as may seem advisable for their protection therein." By an act approved March 3, 1859, congress authorized the secretary of the interior to issue patents to certain Indians, including the Shawnees, "under such conditions and limitations, and under such guards and restrictions, as may be prescribed by the secretary."

The principal question in this case is, Was descent cast upon George Buchannan, the husband, and upon Sally, the child, when Polly Buchannan, née Manture, died in 1860, in possession of the land? The trial court made the following special findings of fact:

"In the year 1861, and while James B. Abbott was United States local agent for the tribe of Shawnee Indians in Kansas, the said tribe of Indians, through its chiefs and councilmen, adopted orally the written laws of the state of Kansas, then in force, relating to descent, distribution and inheritance of real and personal property, and thenceforth until said tribe left the state the said laws were their guidance; and that prior to said period the said tribe of Indians had no law, written or unwritten, nor any custom or usage of their own regulating the descent, distribution and inheritance of real property of which any member of the tribe died seized."

"That from 1864 up the year 1868, the tribe of Shawnee Indians operated under the laws of Kansas relative to and governing the descent, distribution and inheriting of the lands of individual Shawnees, deceased, by the council and chiefs adopting for the tribe the said laws of Kansas."

James B. Abbott, United States local agent for the tribe

of the Shawnees from June, 1861, to 1868, testified upon the trial that some time in the year 1868 he understood that the Shawnee tribe passed a resolution about descents, distributions, and inheritance of lands, differing from the laws of the state of Kansas. In view of the evidence and the findings of the trial court, it cannot be said that at the time Polly Buchannan, *née* Manture, died, the laws of Kansas concerning descent or distribution of the lands of the Shawnee tribe had any operation; nor can any presumption be indulged in that the customs or laws of the Shawnees in this matter followed the Kansas law, or were similar to it. The evidence and the findings are against any such presumption.

In *Brown v. Steele*, 23 Kas. 672, it was said:

"That it appearing that the tribal organization of the Shawnee Indians was still recognized by the political department of the United States government, under the decision of the supreme court of the United States in the case of *The Kansas Indians*, 5 Wall. 737, the descent is cast, not under the Kansas law, but in accordance with the Shawnee law and decision."

Sally Zeigler, *née* Buchannan, died in 1874, and there is no evidence or finding showing, or tending to show, that the laws of Kansas concerning descent or distribution had any operation among the Shawnee tribe at that time. As O'Brien, in order to have any title or possession to the land in dispute, must have established heirship or title to the land in George Buchannan, he is not entitled to recover the land or any part thereof, if he failed to make satisfactory proof thereof. The same may be said concerning the alleged title of David Updegraff, who claimed through a conveyance from Gotleib Zeigler, who married Sallie Buchannan, even if we assume that Sallie Zeigler, *née* Buchannan, inherited anything from her mother, Polly Buchannan, *née* Manture.

3. Evidence—
custom of
tribe.

In the case of *The Kansas Indians*, 5 Wall. 737, Mr. Justice Davis, for the court, said:

"This people [the Shawnees] have their own customs and laws by which they are governed. Because some of these

customs have been abandoned, owing to the proximity of their
white neighbors, may be an evidence of the superior influence
of our race, it does not tend to prove that their tribal organi-
zation is not preserved.    There is no evidence in the record
to show that the Indians with separate estates have not the
same rights in the tribe as those whose estates are held in
common.    Their machinery of government, though simple, is
adapted to their intelligence and wants, and effective, with
faithful agents to watch over them. . . . It may be that
they cannot exist much longer as a distinct people in the pres-
ence of the civilization of Kansas, 'but until they are clothed
with the rights and bound to all the duties of citizens,' they
enjoy the privilege of total immunity from state taxation.
. . . While the general government has a superintending
care over their interests, and continues to treat with them as
a nation, the state of Kansas is estopped from denying their
title to it. . . . As long as the United States recognizes
their national character, they are under the protection of
treaties and the laws of congress, and their property is with-
drawn from the operation of state laws."

At the time that this action was brought, Bugbee and
Cresswell were in the actual possession of the land.    John
C. McCoy, sr., under whom they claim title, took actual pos-
session on the 3d day of March, 1883; therefore, the defend-
ants, through themselves and their grantors, had been in
possession of the land when this action was brought for more
than four years.    It is elementary, that a party seeking to
recover possession of real property must do so
upon the strength of his own title, not upon the
weakness of the title of his adversary.    There-
fore, as there is no evidence in the record showing, or tending
to show, that George Buchannan or Sally Buchannan inherited
any interest in the land from Polly Buchannan, *née* Manture,
the judgment of the trial court refusing possession to O'Brien
and Updegraff, who claim through these parties, must be sus-
tained.

1. Ejectment—
title of claim-
ant.

O'Brien and Updegraff claim that George Buchannan and
Sally Buchannan were the heirs at law of Polly Buchannan.
On the other hand, Bugbee and Cresswell claim that, by the

law and decision of the Shawnees, the title escheated to the tribe, and therefore that the chiefs of the tribe had full authority to execute, with the approval of the secretary of the interior, the deed of February 3, 1882, to John C. McCoy, sr. The burden of proof in this matter was upon O'Brien and Updegraff. They ought to have shown that in 1860, at the death of Polly Buchannan, the descent was cast upon George Buchannan or Sally Buchannan, or both, under the law and decision of the Shawnee tribe. This was not done. The law or decision of a country, a state or an Indian tribe may make any person an heir. An heir at law is simply one who succeeds to the estate of a deceased person under the statute of a country, a state, or the decision of an Indian tribe. (*McKinney v. Stewart*, 5 Kas. 384; *Delashmutt v. Parrent*, 40 id. 641; *Caldwell v. Miller*, 44 id. 12; *Brown v. Steele*, 23 id. 672.)

2. Indian title—descent of real estate.

The probabilities are, from some of the evidence offered, that under the law and decision of the Shawnee tribe of Indians in force in 1860, when Polly Buchannan died, and in force in 1874, when Sally Zeigler died, that, as George Buchannan and Gotleib Zeigler were white men, they could not inherit from either Polly Buchannan or Sally Zeigler, and that after the death of Polly Buchannan and Sally Zeigler no one, excepting the Shawnee tribe, or their chiefs, or the government, could confer legal title to the land upon anyone. But this was not established, unless we indulge in presumptions. In the absence of any evidence tending to show the law or decision of the Shawnee tribe of Indians relating to descent or distribution of lands in 1860, we cannot say what person, if any, succeeded to the estate of Polly Buchannan, deceased. It is shown by the record that Bugbee and Cresswell hold under a deed from the chiefs of the Shawnee tribe, dated February 3, 1882. This deed was approved by the secretary of the interior on October 27, 1882. If any presumptions are to be indulged in, as the general government has the superintending care over the interests of the Shawnee Indians, and as their property is withdrawn from the opera-

tion of the state laws, we might presume that the deed of February 3, 1882, approved by the secretary of the interior, was made in accordance with the Shawnee law, and conferred title. We need not go that far in this case.

Clearly John C. McCoy, sr., and his grantees were not and are not trespassers upon the land. John C. McCoy, sr., took possession of the land on the 3d day of March, 1883, after he had obtained his deed from the chiefs of the Shawnee tribe, and after it had been approved by the secretary of the interior, and properly recorded in the office of the register of deeds in Johnson county; therefore his possession was with color and claim of title. His grantees, including Bugbee and Cresswell, held and now hold possession with color and claim of title. Even if the chiefs of the Shawnee tribe, with the approval of the secretary of the interior, could not confer title, we think it is clearly evident, from the control that the government exercises over the Shawnees and their lands, that they had authority, with the consent of the secretary of the interior, to give John C. McCoy, sr., possession of the land, in the absence of proof showing that any other person had any legal title, or the right of possession.

The case of *Douglass v. Ruffin*, 38 Kas. 530, in this view, does not militate against the judgment of the court below. The case of *Hale v. Wilder*, 8 Kas. 545, has no application, because this court held in that case that the secretary of the interior was not authorized to approve a deed to the land therein referred to.

Neither O'Brien nor Updegraff is, or has been, in the possession of the land, and both have failed to establish better title than Bugbee and Cresswell, who are in actual possession. Neither can O'Brien nor Updegraff claim any title

4. Possession of Indian land— ejectment, not maintained.

under the statute of limitations on account of the possession of their grantors, or the parties through whom they claim, because the title or possession of Polly Manture was so restricted and limited that adverse possession could not give title without the consent of the secretary of the interior. Again, the deed from George Buchannan to

Joachim Rathjen, who quitclaimed to John C. McCoy, sr., on the 12th of August, 1881, counts for nothing. It was never approved by the secretary of the interior, and was void; therefore, neither McCoy nor his grantees are estopped by any recitations therein contained. (7 Am. & Eng. Encyc. of Law, p. 5, note 2; *Merriam v. Railroad Co.*, 117 Mass. 241; 3 Washb., Real Prop., p. 106.)

Further, if George Buchannan had inherited, under the Kansas laws, one-half of the land free from the restrictions of the patent, eighty acres of it would have gone to John C. McCoy, sr., under his deed of April 2, 1866, although not approved by the secretary of the interior, as he did not die until August, 1879. O'Brien only claims from Marow Gibbs under the will of George Buchannan. Clearly, Buchannan's deed of April 2, 1866, is as valid to eighty acres as his will of 1879 to any other part. So, upon any legal view of the case, O'Brien has no claim or title to eighty acres of the land in dispute. But the actual possession of all the land being in Bugbee and Cresswell under color and claim of title, and their right of possession not having been overthrown by any facts disclosed in the record, the judgment of the district court will be affirmed.

All the Justices concurring.